**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
)
MEIXING REN, et al.                                         )
                                                                         )
                             Plaintiffs,            )            Civil No. 1:13-cv-1110-CKK
                                                                         )
            v.                                                         )            ECF Case
                                                                         )
PHOENIX SATELLITE TELEVISION (US), INC.     )
                                                                         )
                             Defendant.             )
_____)


**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR RETALIATION,
DISCRIMINATION, BATTERY,
AND VIOLATIONS OF LABOR LAW**

Plaintiffs, Meixing Ren, Ching-Yi Chang, Taofeng Wang, Haipei Shue, and Fangyuan

Liu, bring this action against Phoenix Satellite Television (US), Inc. ("Phoenix" or "Defendant")

for monetary relief for injuries sustained as a result of retaliation for the Plaintiffs Ren, Chang,

Wang, and Shue's support of another Phoenix employee's complaint of sexual harassment.

Defendant, through its agents Zhengzhu Liu and Tao Lu, terminated two employees after being

informed of their legal actions, demoted the Plaintiffs, reduced their job duties, and subjected

them to ongoing criticism and excessive monitoring.  Defendant also deliberately denied

overtime pay to two of the five Plaintiffs.  Defendant's bureau chief, Zhengzhu Liu, deliberately

subjected Plaintiff Liu to battery and a sexually hostile work environment, as part of a pattern of

sexual harassment and assault against multiple female employees, and Defendant negligently

retained Mr. Liu, thereby causing that battery to occur.

Plaintiffs bring their claims against Phoenix under Title VII of the Civil Rights Act of

1964, *as amended*, 42 U.S.C. § 2000e-1 *et seq.*; the District of Columbia Human Rights Act,

D.C. Code § 2-1401.01 *et seq.*; the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*; and the common law of the District of Columbia.

## JURISDICTION

1.     This court has jurisdiction on the basis of diversity over Plaintiffs' claims under the D.C. Human Rights Act and the common law torts of battery and negligence in retention, pursuant to 28 U.S.C. § 1332(a), as Phoenix's principal place of business is located in California, Phoenix is incorporated in Delaware, and Plaintiffs reside as follows:  Meixing Ren, Annandale, Virginia; Ching-Yi Chang, Arlington, Virginia; Taofeng Wang, Gaithersburg, Maryland; Haipei Shue, Potomac, Maryland; and Fangyuan Liu, Auckland, New Zealand.  More than $75,000 is in controversy as to each Plaintiff.

2.     This Court also has jurisdiction on the basis of federal-law causes of action with respect to Mr. Shue and Mr. Chang, pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e *et seq.*, and Mr. Ren and Mr. Wang, pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e *et seq.*, and 29 U.S.C. § 201 *et seq.*  This Court has supplemental jurisdiction over Mr. Shue, Mr. Ren, Mr. Chang and Mr. Wang's DCHRA claims pursuant to 28 U.S.C. § 1367(a).

3.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(a)(1)-(2), since Defendant maintains a place of business in the District of Columbia, 101 Constitution Avenue, NW, Washington, DC 20001, and a substantial part of the events giving rise to these claims occurred in this District.

## PARTIES

4.     Plaintiff Meixing Ren is a foreign national and citizen of the People's Republic of China, who resides at 3486 Pence Ct., Annandale, Virginia 22003. Plaintiff worked for Phoenix between from April 2011 through July 15, 2013, as a broadcast engineer, at Phoenix's

Washington, D.C., bureau.  Defendant terminated Mr. Ren after it was informed that he would file a lawsuit against Defendant, and one day before the actual filing.

5.      Plaintiff Ching-Yi Chang is a foreign national and citizen of Taiwan, who resides at 2111 Jefferson Davis Highway, #322N, Arlington, Virginia 22202.  Plaintiff worked for Phoenix between April 20, 2010 through the present, as a White House correspondent and reporter, at Phoenix's Washington, D.C., bureau.

6.      Plaintiff Taofeng Wang is a U.S. citizen, who resides at 652 Coral Reef Drive, Gaithersburg, Maryland 20878.  Plaintiff worked for Phoenix from 2006 through the present, primarily as a cameraman although also periodically as a reporter, at Phoenix's Washington, D.C. bureau.

7.      Plaintiff Haipei Shue is a U.S. citizen, who resides at 9714 Glynshire Way, Potomac, Maryland 20854.  Plaintiff worked for Phoenix between April 2011 and December 2012 as a daily news commentator at Phoenix's Washington, D.C. bureau, until Defendant terminated his employment.

8.       Plaintiff Fangyuan Liu is a foreign national and citizen of the People's Republic of China, who resides at 103 Panapa Drive, Auckland 1072, New Zealand.  Plaintiff worked for Phoenix between July 2, 2012 and August 10, 2012, as an intern at Phoenix's Washington, D.C. bureau.

9.      Phoenix is a private company, incorporated in Delaware, with its headquarters at 3440 Wilshire Boulevard, Suite 328, Los Angeles, California 90010, and 12803 Schabarum Avenue, Irwindale, California 91706, and maintains an office at 101 Constitution Avenue NW, Washington, D.C. 20001.

## TITLE VII ADMINISTRATIVE EXHAUSTION

### Meixing Ren, Ching-Yi Chang and Taofeng Wang

10.     On October 15, 2012, Mr. Ren, Mr. Chang, and Mr. Wang filed administrative charges with the EEOC's Washington, D.C. field office.  On February 13, 2013, they amended those charges to set forth claims of retaliatory hostile work environment, Mr. Ren and Mr. Wang added claims of national origin discrimination, Mr. Chang set forth facts describing retaliation in the form of reduced work responsibilities, and Mr. Wang added a claim of associational retaliation.

11.     On July 30, 2013, the EEOC dismissed Mr. Ren's charge and he received a Notice of Right to Sue from the EEOC, providing for a 90-day period in which Mr. Ren may bring suit.  The 90-day deadline would therefore be October 28, 2013.

12.     On July 31, 2013, the EEOC dismissed Mr. Wang's charge and he received a Notice of Right to Sue from the EEOC, providing for a 90-day period in which Mr. Wang may bring suit.  The 90-day deadline would therefore be October 29, 2013.

13.     On July 31, 2013, the EEOC dismissed Mr. Chang's charge and he received a Notice of Right to Sue from the EEOC, providing for a 90-day period in which Mr. Chang may bring suit.  The 90-day deadline would therefore be October 29, 2013.

14.      The claims of Mr. Ren, Mr. Chang, and Mr. Wang under Title VII of the Civil Rights Act have therefore been properly exhausted with the EEOC and are timely before the Court.

### Haipei Shue

15.     On March 15, 2013, Mr. Shue filed a completed administrative charge with the EEOC's Washington, D.C. field office.  He first initiated the charge filing process when he

4

accompanied Mr. Ren, Mr. Chang, and Mr. Wang to the EEOC on October 15, 2012.

16.     On June 25, 2013, the EEOC dismissed Mr. Shue's charge and he received a Notice of Right to Sue, providing for a 90-day period in which Mr. Shue may bring suit.  The 90-day deadline would therefore be September 23, 2013.

17.     Mr. Shue's claims under Title VII of the Civil Rights Act have therefore been properly exhausted with the EEOC and are timely before the Court.

## FACTUAL BACKGROUND

### Phoenix's U.S. Operations

18.     Phoenix Satellite Television (US), Inc. is the American subsidiary for Phoenix Media Group, a Hong Kong-based media conglomerate that produces, among other things, television news directed toward a Chinese-language audience.  In the United States, the company maintains its headquarters in Los Angeles and two offices on the East Coast, in New York City and Washington, D.C.

19.     Zhengzhu Liu was Phoenix Satellite Television's North American bureau chief, and supervised both the D.C. and New York City bureaus, among others.  Mr. Liu's only direct superior within the company was Changle Liu, the Chief Executive Officer of Phoenix's parent corporation based in Hong Kong.  In no U.S. bureau, including the headquarters, did any corporate official supervise Mr. Liu.

20.     In his capacity as bureau chief, Mr. Liu both supervised the production of news programming and the other office functions of the New York City and Washington, D.C. bureaus, and exercised authority over both the hiring and termination of Phoenix employees and interns, including conducting interviews and making hiring and firing decisions.

### Zhengzhu Liu's Predatory Sexual Misconduct, Harassment and Retaliation

21.     Throughout his employment with Phoenix, Mr. Liu sexually harassed and sexually assaulted Phoenix's female employees and interns.  This sexually aggressive behavior included unwanted touching, inappropriate sexual comments, and sexual assault—both inside and outside the office at interviews and work-related events.  In one case, he went to a female employee's home and attempted to rape her.  Mr. Liu repeatedly lured and pressured female interns, employees, and job candidates into visiting his hotel room under the guise of discussing job performance or employment opportunities.  During these visits, Mr. Liu inappropriately groped these women, kissed them, and attempted to have sex with them. In all cases, the message—which Mr. Liu made explicit at times—was clear: to advance in one's career at Phoenix, the female employee, intern, or applicant had to submit to Mr. Liu's unwanted sexual advances.

22.     Mr. Liu intentionally preyed on the most vulnerable employees at Phoenix, primarily those who were just beginning their careers in America or were looking to advance at Phoenix as interns.  Boasting of his connections to Phoenix's Hong Kong headquarters and promising career advancement or a green card to female employees and interns, Mr. Liu attempted to pressure these young women into sleeping with him.  When they were not receptive to Mr. Liu's behavior, Mr. Liu retaliated against them by unfairly criticizing them, subjecting them to harsh work conditions, denying them job opportunities, and firing them.

### Phoenix's Awareness of Mr. Liu's Unlawful Conduct

23.     Phoenix, despite maintaining regular offices in at least three U.S. jurisdictions — California, New York, and the District of Columbia — maintains a managerial structure and employment practices that encourages violations of federal, state and local civil rights and labor

statutes.

24.     The company maintains no Human Resources presence at either of its East Coast

offices, and invests the North American bureau chief — formerly Mr. Liu — with virtually

unchecked discretion over interviewing, hiring and dismissing employees, job candidates and

interns.

25.     For years, the company did not provide its sexual harassment policy, or

handbook, to employees in the East Coast offices.  As of April 2013, Plaintiffs Taofeng Wang

and Ching-Yi Chang had never seen the employee handbook, despite having worked at the

company for seven years and three years, respectively.

26.     Mr. Liu, the only supervisor at these bureaus, frequently derided the Los Angeles

office, the location of Human Resources for Phoenix, and bragged in front of his employees

about the superior authority Hong Kong management had granted him to ignore the Los Angeles

office.

27.     Phoenix has long been on notice about Mr. Liu's sexually aggressive conduct

toward female employees and interns, but failed to take any action for years.  Jackie Pang, a

senior employee in the New York City bureau, is aware of at least four interns who have been

sexually harassed by Mr. Liu, some of whom had their internships cut short after rejecting Mr.

Liu's advances, and has recommended that these victims consider seeking employment outside

of Phoenix.

28.     Other employees have also placed Phoenix on notice about Mr. Liu's

inappropriate sexual misconduct.  In one instance before 2006, when a female employee

complained of Mr. Liu's sexual harassment in a letter she sent to Hong Kong management,

Phoenix's only action was to forward the complaint to Mr. Liu, who then forced the complainant

to leave the company shortly thereafter.

29.     On August 22, 2009, Plaintiff Taofeng Wang spoke with Los Angeles executive Shiping Zeng in Las Vegas regarding Mr. Liu's attempts to condition a job opportunity on Mr. Wang's wife acceding to his sexual advances and attempted rape.  Mr. Wang also discussed with her Mr. Liu's sexually aggressive behavior toward female employees of the company generally. This conversation occurred at the Venetian Hotel in Las Vegas, Nevada, during rehearsals for a beauty pageant which the Defendant sponsors, the Miss Chinese Cosmos of the Americas Pageant.

30.     Ms. Zeng acknowledged that Mr. Liu harassed female employees at Phoenix, and volunteered the information that he had done so to an employee at the Los Angeles office.

31.     Ms. Zeng further responded that she had no authority over Mr. Liu and that Mr. Wang would have to protect his wife himself.

32.     Despite these reports, and the apparent prior disclosures to Ms. Zeng that Mr. Liu had harassed other employees in the Los Angeles bureau, Phoenix made no effort to correct or prevent Mr. Liu's conduct.  No permanent Human Resources presence was ever instituted at the New York or District of Columbia offices, Mr. Liu was never disciplined, and he continued to exercise direct supervisory authority over numerous female employees and interns in the East Coast bureaus.  Phoenix's tolerance of Mr. Liu's illegal conduct and sexual harassment allowed Mr. Liu to continue this pattern of sexual harassment and assaults for at least 8 years. In short, Phoenix informed Mr. Liu and Phoenix employees that the company would not require Mr. Liu to conform his conduct to U.S. laws prohibiting sexual harassment in the workplace.

**Phoenix Permits Mr. Liu to Continue Sexually Harassing Female Employees and Interns**

33.     Just months after Mr. Wang placed Ms. Zeng on notice, in August 2009, that Mr. Liu was sexually harassing female employees and job candidates, Mr. Liu was permitted to hire and sexually harass interns in the company's New York office.  In January 2010, Mr. Liu attempted physically to coerce intern Lihuan Wang into sleeping with him, by luring her to his hotel room after a meal with co-workers by the pretense that he wanted to discuss her job performance.  In the months that followed, every time she raised the question of permanent employment, Mr. Liu propositioned her. On one occasion, he invited her to meet with him alone in Atlantic City to discuss "job opportunities."  Although he had initially told her she could gain permanent employment following her graduation from her Master's program at Syracuse University, once Ms. Wang rejected his sexual advances he disclaimed having any opportunities to hire her and firmly stated that the company would not support an application for a work visa.

34.     Following her internship, Ms. Wang warned a college classmate, Qian Chen, who interned with Phoenix's New York office in the summer of 2010, of Mr. Liu's sexual harassment.  During her internship, Mr. Liu repeatedly invited Ms. Chen to his hotel room, and when she declined his invitations, he ceased talking about a year long opportunity that he had discussed with her previously, and then quickly replaced her with another intern before her internship ended.

35.     Between 2009 and 2010, Mr. Liu also invited Heidi Chang, a reporter in Phoenix's N.Y bureau, to his hotel on four or five occasions for what Mr. Liu falsely claimed were work-related purposes.  On one occasion when Ms. Chang met with Mr. Liu, he pressed his body against her and groped her, in an attempt to have sex with her.  Throughout the time that Mr. Liu was Ms. Chang's supervisor, a period of approximately six years, Mr. Liu also touched

Ms. Chang inappropriately for prolonged periods of time and made comments about women, sex, and rape.

36.     In July 2011, Mr. Liu also invited N.Y. bureau reporter Bingying Liu to dinner to discuss a reporting assignment. He insisted she visit him in his hotel room, and, during the course of the evening, made comments about rape, oral sex, and sexual affairs.

37.     Mr. Liu also repeatedly propositioned and sexually harassed Plaintiff Fangyuan Liu during an internship at the D.C. bureau over the summer of 2012.  Just as with Ms. Wang, Mr. Liu made inappropriate sexual comments and inappropriately invited Plaintiff Liu to travel with him to Atlantic City.  He also subjected Plaintiff Liu to unwelcome and offensive physical contact.

38.     In August 2012, Mr. Liu attempted to coerce a job applicant, Anne Shih, to have sex with him during a job interview, which he insisted be held at his hotel room, so they could "practice recording" her reporting. While she was there, Mr. Liu forced himself physically upon Ms. Shih. After she refused his advances, Mr. Liu told Ms. Shih that there was no longer a position in New York available for her, although he had previously told her that a reporting position would become available.  When she called Plaintiff Ching-Yi Chang regarding the incident, he informed her that another Phoenix employee, Bingru Wang, was going to file a complaint against Mr. Liu and Phoenix for sexual harassment and asked her to act as a witness.

### Mr. Liu Assaulted Bingru Wang and Plaintiffs Shue, Wang, Ren and Chang Helped Her Report His Misconduct to the EEOC

39.     In September 2012, Plaintiffs Meixing Ren, Ching-Yi Chang, Haipei Shue, and Taofeng Wang learned of a disturbing incident in which Mr. Liu had sexually assaulted a co-worker, Bingru Wang, in Phoenix's D.C. office.  All four of them, along with an employee in the New York bureau, Bingying Liu, agreed to support her complaint to the EEOC.  Plaintiffs agreed

to contact other female victims of Mr. Liu's harassment, including Plaintiff Fran Liu, and to assist Ms. Wang in pursuing her claims. Bingying Liu sent a letter in support of the complaint, detailing Mr. Liu's past misconduct.  Mr. Shue accompanied Ms. Wang to the EEOC's District of Columbia field office to assist her in filing a charge of sexual harassment against the company.

40.     Ms. Wang ultimately settled with the company, but Phoenix management left Mr. Liu in place as one of the company's highest-ranking U.S. executives, even after its lawyers recommended Mr. Liu's transfer or removal.  In the process, Mr. Liu learned that Plaintiffs Shue, Chang, Wang and Ren had supported Ms. Wang's claims against the company and Mr. Liu. While the case was being settled, Mr. Liu left for Hong Kong, returning only after the complaint against him had been withdrawn.  As in the past, Mr. Liu was not disciplined, even as the company was once again placed on notice that he was harassing and assaulting female employees on company property or while invoking his authority as an employee.

41.     Once Mr. Liu returned, on October 11, 2012, he stated over the phone to a cameraman in the D.C. bureau, Yiqiu Chen, that he intended to "clean up" Mr. Shue, Mr. Chang, Mr. Wang and Mr. Ren.  In Chinese, to "clean up" is a euphemism for terminating employment.

42.     In September 2012, executives from the Hong Kong office, including Lihong Yan, came to the D.C. bureau and met with the Plaintiffs.  They interviewed the employees who had supported Ms. Wang's complaint and implicitly threatened Plaintiffs Ren, Chang and Wang. Their veiled threats included asking them "whether you want to continue working here?" or "are you happy working here?"  They then emphasized the importance of following Mr. Liu's instructions and supporting him as the supervisor.  Mr. Yan told Plaintiffs Chang, Wang and Ren that they must now "obey Mr. Liu."

43.     On October 15, 2012, Mr. Chang, Mr. Wang, Mr. Shue and Mr. Ren went to the EEOC field office in Washington, D.C. to file complaints in response to Mr. Liu's and the company's threats of retaliation.  The company was provided notice of their charges sometime within one week of their visit to the EEOC.

44.     On October 24, 2012, Plaintiffs retained Lynne Bernabei, Esquire, as their legal counsel to represent them with respect to any potential further retaliation from Mr. Liu or Phoenix.  On October 24, 2012, Ms. Bernabei sent a letter to Phoenix stating that she represented Plaintiffs and other current and former Phoenix employees with respect to their EEOC charge and their retaliation claims against the company.

45.     Mr. Liu then began intimidating Mr. Ren, Mr. Shue, Mr. Chang and Mr. Wang and interfering with their employment by withholding compensation or changing their job duties, a pattern of behavior that continued with his successor, Tao Lu. Specific actions taken by Mr. Liu and Mr. Lu against the Plaintiffs are discussed further *infra* at paragraphs 63-160.

46.     On December 3, 2012, Mr. Shue, Mr. Chang, Mr. Wang and Mr. Ren notified Phoenix in writing through their attorney of the company's threats of retaliation and discriminatory denials of overtime pay.

47.     Despite the prior complaints to the Los Angeles office, Phoenix continued to employ Mr. Liu and terminated his employment only after Plaintiffs and other current and former employees and interns threatened the company with litigation in November 2012.  The company fired Mr. Liu shortly before December 31, 2012, only after the named Plaintiffs and other current and past Phoenix employees and interns demanded it.

## Mr. Liu's Discrimination, Harassment, Battery and Retaliation Against Plaintiffs

### (1) Fangyuan "Fran" Liu

48.     Fangyuan Liu was an intern in Phoenix's D.C. bureau during the summer of 2012. Her internship began on July 2, 2012, and ended on August 10, 2012.  Ms. Liu did not receive academic credit for the internship.  At the time, she was a 23-year-old student at the University of Minnesota's journalism program.  Ms. Liu obtained her internship in Phoenix's D.C. bureau through a family friend (known as "uncle") who knows Mr. Liu.

49.     Throughout her internship, Mr. Liu subjected Ms. Liu to sexual comments, unwanted touching, and inappropriate invitations to go with him to Atlantic City.

50.     Ms. Liu had only been working at her internship a day or two when Mr. Liu first invited her to accompany him alone on an overnight trip to Atlantic City.  Mr. Liu told Ms. Liu that they would leave on Thursday and return on Sunday.  Ms. Liu, not knowing how to respond to her new supervisor, remained silent.  On or around Wednesday, July 4, 2012 Mr. Liu asked her again to go to Atlantic City.  Ms. Liu asked whether other coworkers or Mr. Liu's wife were going, and Mr. Liu said no.  When Ms. Liu then asked if they would be going to Atlantic City and returning the same day, Mr. Liu said, "You can't come back on the same day after the casino because you'll be busy drinking."  Ms. Liu suggested that Mr. Liu ask Uncle to go on the trip, but Mr. Liu said he would not be interested.  Only after Ms. Liu had repeatedly told Mr. Liu she did not want to go did Mr. Liu stop pressuring Ms. Liu to go to Atlantic City with him.

51.     After beginning work at Phoenix, Ms. Liu intentionally adopted the tone and mannerisms of a child around Mr. Liu in order to dissuade him from sexually harassing her.  For example, she offered to buy Mr. Liu ice cream and called other coworkers "brother" and "sister." Ms. Liu attempted to convey to Mr. Liu that she was naïve and "just a kid," since she wanted Mr.

Liu to see her as a girl and not a woman.  To her knowledge, she was the youngest person in the office at that time.

52.     Despite this strategy, on several occasions during Ms. Liu's internship, Mr. Liu made sexual comments to Ms. Liu.  On one occasion, Mr. Liu asked Ms. Liu where her boyfriend lived.  When Ms. Liu told Mr. Liu that her boyfriend lived in another country, Mr. Liu asked her if she visited him.  He then began discussing the "desires" and "needs" of human beings.  Mr. Liu inappropriately told Ms. Liu that "we all need sex."  On another occasion in the office, Mr. Liu made a comment about a female reporter's body.  He informed Ms. Liu that another female reporter was not wearing a bra while being recorded.  Mr. Liu said that he could "see [this reporter's] breasts through her shirt" and commented that her "nipples were showing." Ms. Liu found these comments unwelcome, and felt extremely embarrassed, humiliated and uncomfortable in Mr. Liu's presence as a result of his comments.

53.     On another occasion, approximately the week of July 23, 2012, Mr. Liu asked Ms. Liu to go to lunch with him in the dining hall.  Because he was her supervisor and she felt she had no choice, Ms. Liu agreed to attend lunch with Mr. Liu.  During their lunch, which lasted approximately an hour, Mr. Liu made several inappropriate sexual comments to Ms. Liu.  Mr. Liu discussed the sexual abilities of his son's friend.  He said that although his son's friend is very skinny, he has a beautiful girlfriend because he is good in bed.  When explaining this, Mr. Liu used the equivalent of the Chinese word "fuck."  Mr. Liu then began talking about his visits to strip clubs.  He told Ms. Liu that at the strip club, "all the women are naked, but you can't touch them."  He said however, that the strippers can touch the audience.  He also said that "when the girls are dancing in your lap and on stage," you can see their "vaginas." Ms. Liu found this conversation unwelcome and became visibly uncomfortable with the subject matter of the

conversation and Mr. Liu's use of the words "vagina" and "fuck."  She remained silent throughout this conversation and did not participate.

54.     During this lunch, Mr. Liu also brought up a friend of his who was having a sexual affair.  He said that his friend decided to have a sexual relationship with another woman because his wife was not around and he has "needs and desires."  Mr. Liu said "as long as their wives don't notice, men can have affairs."  He also said an affair was "not a big deal" and "that's just how men are."  Mr. Liu then asked Ms. Liu if she had been to any clubs or bars.  When she replied that she had not been to any clubs, but had visited a bar once or twice, Mr. Liu told her that she was "very pure."  After lunch, on the walk back to the office, Mr. Liu put his hands on Ms. Liu's shoulder and dragged her toward him.  Ms. Liu made clear that Mr. Liu's advance was unwelcome by trying to pull away from him as they walked.  After eight to ten seconds, Mr. Liu finally removed his arm from Ms. Liu.

55.     Mr. Liu touched Ms. Liu on several other occasions during her internship.  He would often touch her shoulder or waist.  Ms. Liu was very uncomfortable with Mr. Liu's touching and unwelcome sexual comments and made it clear that she found the advances unwelcome by pulling away from him.  Ms. Liu also attempted to avoid Mr. Liu because of his insistence on touching her.  However, Mr. Liu often found excuses to speak with her and touch her, despite her obvious discomfort and fear of him.

56.     For the last two weeks of the internship, Ms. Liu had to take the MARC train to the office every morning due to a change in her living arrangements.  Other employees typically arrived around 11:00 A.M., but because of the MARC train schedule, Ms. Liu arrived at around 9:00 A.M.  Mr. Liu usually came into the office at around 9:00 A.M., before any of the other employees arrived.  Ms. Liu realized this on the first morning of that two week period when she

arrived to the office and Mr. Liu was the only person there.  Ms. Liu was afraid to be alone with

Mr. Liu and felt very uncomfortable, so she excused herself and left the office that morning.

Every morning for the next two weeks, as she traveled to work, Ms. Liu worried about how Mr.

Liu might touch or sexually harass her if they were alone together in the office.  Once she

arrived, instead of staying in the office during the period before work started, she would wait

outside the building or in the hallway or even hide in the bathroom, in order to avoid seeing Mr.

Liu.

57.     A week before Ms. Liu left her internship, Mr. Liu again asked her to visit

Atlantic City with him.  Ms. Liu told Mr. Liu she did not want to go to Atlantic City and made

clear she did not want any sexual relationship with Mr. Liu.

58.     During the last week of the internship, Ms. Liu brought two practice demos that

she had completed to Mr. Liu's office and showed Mr. Liu one of the demos she had made.  Mr.

Liu was sitting at his desk, and Ms. Liu was standing near him.  He complimented her demo and

then grabbed Ms. Liu's thigh and said in Chinese "come over to me."  Ms. Liu recorded this

statement on her iPhone and still possesses a copy of this recording.  In response, Ms. Liu

stepped away from Mr. Liu and said "Oh Mr. Liu, you are too nice to me" in order to get away

from Mr. Liu.  Mr. Liu did not say anything and just laughed.

59.     Mr. Liu's sexual harassment prevented Ms. Liu from taking full advantage of her

internship with Phoenix.  Because of Mr. Liu's behavior, she was cautious of her male coworkers

at Phoenix and did not speak to or spend time with them outside of work.  She also avoided

going to work-related events for fear that Mr. Liu might try to be alone with her.  For example,

during the last week of Ms. Liu's internship, Mr. Liu e-mailed Ms. Liu and two other reporters to

invite them to a rooftop party with a communications company the following week.  Ms. Liu was

surprised that she was invited because she was the only intern invited to the party and was eager to network with the other reporters there.  Because she was concerned that Mr. Liu would insist on giving her a ride home after the event, she spoke with her parents, who warned her not to attend the event.  She asked her coworker, Plaintiff Ching-Yi Chang, if he could give her a ride home after the event, and he said he could.  However, Ms. Liu suspected that Mr. Liu would insist on giving her a ride home and that Mr. Chang could not disagree with Mr. Liu, since Mr. Liu was his boss.  Therefore, Ms. Liu told Mr. Liu she could not attend the gathering.

60.     Ms. Liu left her internship with Phoenix on August 10, 2012, one week earlier than planned, due to Mr. Liu's inappropriate sexual comments and repeated unwelcome physical contact.

61.     Mr. Liu's behavior made Ms. Liu seriously reconsider her decision to pursue journalism as a career, a career to which she had been committed since childhood.  Throughout her internship, the message Mr. Liu sent to Ms. Liu through his sexual harassment was that if she wanted to advance as a journalist, she would have to give in to his advances and have sex with him.  She knew that she could not put up with Mr. Liu's sexual harassment, and she would never sleep with a supervisor to advance her career.  She came to America to pursue a career in journalism, but has subsequently reconsidered her career plans.

62.     Mr. Liu's sexual harassment caused Ms. Liu great stress, fear, and depression.  Ms. Liu, who has no family in America, felt isolated and afraid throughout her internship at Phoenix.  She is now worried that Mr. Liu will hurt her chances of getting a career in the journalism industry.  She is also concerned for her personal safety and anxious that Mr. Liu, who is well connected to the Communist Party and the Chinese government, will seek revenge on her family members in China.  Since Ms. Liu obtained counsel, Ms. Liu has already been threatened

by Mr. Liu and Phoenix. Jiyan Wang, Executive Vice President at Phoenix's Hong Kong office and Director of the Phoenix Chinese Channel, contacted Ms. Liu's family friend, whom Ms. Liu's family calls "uncle," and asked him to pressure Ms. Liu to drop her charges against Phoenix, instructing "uncle" to arrange a meeting between Ms. Liu's mother and Mr. Wang and to tell Ms. Liu's mother that if Ms. Liu withdrew from the case, Phoenix could get Ms. Liu a job at a TV station.

### (2)  Haipei Shue

63.    Mr. Shue worked for Phoenix between April 2011 and December 2012 as a daily news commentator at Phoenix's Washington, D.C. bureau office.

64.    In that role, he provided editorial content on major news stories for the company from Phoenix's D.C. studio, particularly American politics and election coverage.  Mr. Shue's duties as commentator were essentially part-time; he was compensated for producing a nightly segment where he commented on the days' news events.  Mr. Shue was paid per day worked, but had no employment contract with Phoenix.  He did have an understanding with Mr. Liu, however, that he would be paid for his time on a bi-weekly basis.  Mr. Shue performed his duties under Mr. Liu's supervision and at his direction, and performed his duties exclusively at Phoenix's D.C. bureau office and studio.  Like other employees at the D.C. office, he regularly attended staff meetings and events and was normally copied in on office-wide communications.

65.    Mr. Liu exercised direct and content-specific control over Mr. Shue's commentary.  Throughout Mr. Shue's employment at Phoenix, the content of what he said on the air was restricted: any discussion of the Chinese Communist Party, Party leaders, government officials, or China's relationship with the United States required pre-approval by Mr. Liu in order to avoid provoking hostility from China's government.

66.     Mr. Liu exercised this control over Mr. Shue's commentary by requiring advance discussion of any segment that would discuss politically sensitive subjects and by critiquing Mr. Shue's commentary segments after they aired.  These critiques took the form of specific instructions regarding how to discuss political issues relating to China's government, the Communist Party, and China's relationship with the United States.  Through pre-broadcast review of the segments' content and post-broadcast criticism of any deviation from a pre-approved discussion, Mr. Liu and Phoenix exercised direct daily control over how Mr. Shue performed his role as a commentator.

67.     Mr. Liu responded to Mr. Shue's support of Ms. Wang's EEOC charge by reducing Mr. Shue's hours in the studio, in addition to the threat made by Mr. Liu to "clean up" Mr. Shue.  On October 30, 2012, Mr. Liu instructed a Phoenix employee to inform Mr. Shue that he did not need to come in that evening to record a segment, which was the first time this had taken place in the 18 months of Mr. Shue's employment at the D.C. bureau.  Further, he stated to both Mr. Chang and the entire full-time staff at a meeting in early November that from now on, the host of the program featuring Mr. Shue's commentary would have discretion whether to include Mr. Shue on a given evening, and joked that cutting back his duties would save the company money.  On several other occasions, Mr. Liu discouraged Mr. Shue from coming into work at the D.C. bureau, stating that no commentary work would be necessary that evening.

68.     Mr. Liu then brought in an outside commentator for segments on the presidential election, and excluded Mr. Shue from performing his usual commentary.  Mr. Shue had previously been Phoenix's regular commentator on elections before becoming a regular staff member in the spring of 2010—the use of an outside expert was clearly in response to his efforts to contact witnesses and otherwise support Ms. Wang's harassment complaint in September

2012.

69.     Mr. Liu then refused to pay Mr. Shue and claimed that his employment was a matter of Mr. Liu's budgetary discretion.  Defendant did not pay Mr. Shue for a full six weeks after he filed his EEOC charge.  When he e-mailed Mr. Liu on November 18, 2012 to ask why there had been a nearly four-week delay in payment for his services, Mr. Liu responded that the funding for a commentator was not in the bureau's regular budget and that Mr. Liu had to approve additional funding to pay Mr. Shue.  However, Mr. Shue's predecessor at the D.C. office had been paid regularly during the course of his employment with no mention of any such restrictions or concerns.  Similarly, the commentator from Hong Kong was brought in to discuss the Presidential election at additional cost—yet there was no mention of a lack of funding to do so.  Moreover, during this same period Mr. Liu began interviewing and hiring new employees for the D.C. bureau, such as Hao Fu whom Mr. Liu hired the day after interviewing him, on November 1, 2012.  Mr. Shue also contacted Ms. Zeng in Los Angeles, who confirmed that there was no lack of funding for a commentator in the budget for the D.C. bureau.  Mr. Liu finally relented and paid Mr. Shue in late November 2012.

70.     On December 26, 2012, the company terminated Mr. Shue.  The stated basis for firing Mr. Shue a mere three weeks after counsel notified the company of Mr. Liu's retaliatory threats was that his services as a commentator were no longer needed, based on a "global" program review conducted in the Hong Kong headquarters of Phoenix's parent company.  However, since Mr. Shue was terminated, there have been no programming changes at other bureaus abroad, including those in Europe and Asia, and the company continues to feature daily news commentary, particularly on events relating to American politics.

71.     For the first two to three months following Mr. Shue's termination, commentary was provided by guest experts or reporters from the D.C. bureau, including Jennifer Lee, a recent hire at Phoenix. Beginning in approximately March 2013, however, the company settled on two commentators who alternate, each usually providing commentary on a daily or near-daily basis for roughly a week at a time.

72.     Despite claiming that a daily commentator was not needed based on the Hong Kong program review, Phoenix has not offered Mr. Shue any opportunity to serve as a commentator for a single segment or series of segments.  Before Mr. Shue assisted Ms. Wang in filing her EEOC charge, however, the company had considered him sufficiently knowledgeable and capable as a commentator on American news stories to broadcast his segments virtually every day for more than a year.

73.     In July 2013, after having commentary regarding U.S. news provided by commentators based in Hong Kong, the company sent Ningsi Lv, a Hong Kong-based commentator, to the D.C. bureau to provide commentary from that studio.  He now appears daily from the D.C. bureau and serves the same function that Mr. Shue did, eight months earlier.

### (3)  Meixing Ren

74.     Plaintiff Meixing Ren worked as a broadcast engineer in Phoenix's D.C. bureau from April 2011 to July 18, 2013. Defendant terminated his employment the day before this suit was filed on bogus charges of poor performance.

75.     Mr. Chen told Mr. Ren of Mr. Liu's intent to retaliate against the Plaintiffs.  Like the other Plaintiffs in the D.C. bureau as of September 2012, he supported Ms. Wang's EEOC charge and was aware of Mr. Liu's sexual harassment of Ms. Wang and other female employees. As was the case with Mr. Chang and Mr. Wang, company executive Lihong Yan threatened him

and instructed him to obey Mr. Liu.  Also like the other Plaintiffs, Mr. Liu immediately took

steps to isolate Mr. Ren from interactions with other Phoenix staff — after Mr. Liu returned from

Hong Kong and Ms. Wang's case was settled privately with the company, the reporters and

cameramen at the D.C. bureau ceased interacting with Mr. Ren socially or in the office unless a

specific project required it.

76.     Mr. Liu then began sending e-mails to Plaintiffs Shue, Chang, Wang and Ren in

English, in which he unfairly criticized their performance, even though the entire office reads

and speaks Chinese.  These e-mails were clearly written so that an English-speaking reviewer

could use them later as evidence of poor performance.

77.     After Plaintiffs Shue, Chang, Wang and Ren had notified the company of Mr.

Liu's retaliatory threats by filing an EEOC charge, retaining counsel, and describing Mr. Liu's

misconduct in detail, the company did not remedy the situation but escalated its retaliation

against them.

78.     As a direct result of the complaints made by Plaintiffs and other current or former

Phoenix employees, the company terminated Mr. Liu in late December 2012, and replaced him

with a new bureau chief, Tao Lu.

79.     It became clear immediately, however, that removing Mr. Liu was merely an

effort by the company to distance itself from his prior sexual harassment and other misconduct.

Plaintiffs would remain targets for retaliation so long as they and others asserted that the

company had violated the law.

80.     After Mr. Liu was terminated, the company continued to threaten Plaintiffs Ren,

Chang and Wang, both directly, by telling them that their futures would be negatively affected if

they proceeded to court, and indirectly, by terminating Mr. Shue and threatening other

employees who joined Mr. Ren in complaining about Mr. Liu's conduct.

81.     On or about January 6, 2013, a Phoenix executive in Hong Kong, Jiyan Wang, contacted another victim of Mr. Liu's sexual harassment, Plaintiff Fangyuan Liu, to attempt to persuade her to abandon her claims against the company.

82.     During the same period, Wu Xiaoyong, the CEO of Phoenix's US subsidiary, contacted Mr. Ren's co-worker and co-complainant, Taofeng Wang, in an attempt to persuade him to withdraw his charges.  If Mr. Wang and the other Plaintiffs wanted to proceed with litigation, Mr. Wu said, "Phoenix has lots of lawyers too."

83.     The company has also taken steps to scrutinize excessively Plaintiffs in the hope that it will generate evidence it can use later to justify terminating them.  On January 18, in response to a co-worker's claim that her laptop had been damaged – one key had fallen off – Mr. Lu implied Mr. Chang was responsible for damaging it and used this event to justify installing a security camera in Plaintiffs' work area.  Mr. Lu then informed Mr. Ren that it will transmit images directly to the company's management in Hong Kong, so that they could monitor the D.C. bureau.

84.     On January 22, 2013, Lihong Yan, the executive who threatened Plaintiffs when Mr. Liu had returned to the office in October, returned to the D.C. bureau.  Just as before, he reminded all of them that they needed to obey management, now Mr. Lu instead of Mr. Liu.

85.     The company's threats became even more explicit on January 25, 2013, when several Phoenix executives came to the D.C. bureau to speak to Mr. Chang and Mr. Ren.  The executives included Mr. Wu, Ningning Shi, the company's director of Capital Fund Management and Human Resources, as well as the HR director from the Los Angeles office and a female attorney from Hong Kong.  They informed Plaintiffs Ren and Chang that "Mr. Liu's gone, it's

over," and that "you can have a bright future at Phoenix" but "if you want to go to court, we will go to court." Mr. Wu then told a story about an employee who sued him and lost in court, and then he expressly threatened their jobs: "there are much more capable and talented people who want to work for Phoenix TV, so you guys here should treasure what you have now."

86.     Mr. Lu has continued Mr. Liu's pattern of isolating the Plaintiffs. Before they complained to the EEOC, Plaintiffs were included in planning coverage and social outings with their co-workers and the bureau chief. Mr. Lu now routinely excludes Plaintiffs from these meetings and interactions.

87.     Most recently, Mr. Lu continued to harass and intimidate Mr. Ren in the workplace by making impossible demands and then faulting him for failing to satisfy them.

88.     On a daily basis, Mr. Lu closely monitored Mr. Ren's movements in the office, following him on his lunch break to other rooms in the building, and calling him to confirm his location if he left the office even for brief periods of time.

89.     On an increasing number of occasions, he wrote disciplinary warnings to Mr. Ren for minor or nonexistent problems, such as arriving minutes late to a meeting. Prior to his complaints to the EEOC, Mr. Ren had never been disciplined by Phoenix management. With each month after Mr. Liu's termination, Mr. Lu's discipline of Mr. Ren became more arbitrary.

90.     Phoenix's Employee Handbook, last revised in 2004, states that after two written warnings, an employee may be discharged for any infraction afterward.

91.     On February 6, 2013, at 8:20 A.M., Mr. Lu called and demanded that Mr. Ren begin work at 9:15 A.M., because Mr. Wang had been sent out to shoot footage and someone needed to assist with production of the morning segment. Normally Mr. Ren begins work at about 10:00 A.M., after dropping his five-year-old son off at school, so he hurried to reach the

office, which takes at least an hour by car in morning traffic.  He arrived at the office building at 9:38 A.M., and successfully assisted with the broadcast at 9:45.  Mr. Lu proceeded to discipline him for not arriving at the studio by 9:15 and later that day wrote an e-mail to Human Resources in Los Angeles, formally documenting that he had warned him about his failure to comply with this request.  Later that day, Mr. Lu met with Mr. Ren and Mr. Wang and stated that Mr. Ren was responsible for being at work whenever he needed him, and that other employees have been fired for not being able to arrive when instructed.  Mr. Lu had given him no advance notice that Mr. Ren would need to be early.  Defendant then used this bogus incident to fabricate a complaint about Mr. Ren's performance, and document it to HR.

92.     On April 25, 2013, Mr. Lu announced that he would now require Mr. Ren to submit a daily report detailing his work, a requirement that only applies to Mr. Ren.  When Mr. Ren stated that this would be an onerous requirement and asked why it was necessary, Mr. Lu became agitated and then gave Mr. Ren a formal warning for "overreaction," falsely claiming in writing to Phoenix HR in Los Angeles that Mr. Ren was behaving in an erratic and unprofessional manner.

93.     Mr. Ren acceded to Mr. Lu's request that he submit a daily work summary, even though this requirement served no apparent purpose. Mr. Lu never responded to or acknowledged these reports, and contrary to his assertion that he required them to effectively manage Mr. Ren, did not use them in making decisions about assignments or projects.

94.     On June 3, Mr. Lu wrote Mr. Ren up for arriving at the office 20 minutes late due to a late flight arrival.  Mr. Ren had spent the preceding week working at Phoenix's Los Angeles office, and had agreed that he would return to the D.C. bureau upon his flight's arrival on Monday morning.  Mr. Ren's flight arrived late due to mechanical trouble, and he traveled

directly from Dulles airport to the office. Yet because he was 20 minutes late to a meeting Mr.

Lu had scheduled, Mr. Lu gave Mr. Ren a written warning. Despite his apparent concern for

punctuality as applied to Mr. Ren, Mr. Lu routinely allows Mr. Lai, a cameraman, and Ms. Lee, a

reporter hired by Defendant in August 2012 and who received favorable treatment from Mr. Liu,

to arrive after 11:00 A.M. and to leave at 6:00 P.M., when the bureau's workday extends from

10:00 A.M. to 7:00 P.M.

95.     At the same time, Mr. Lu has tolerated criminal misconduct by another employee,

Mr. Lai. The evening of July 10, 2013, Mr. Lai assaulted Mr. Chen — the cameraman who

informed Plaintiffs about Mr. Liu's intent to terminate them for assisting Ms. Wang with her

EEOC complaint — by jamming a thumb drive into his eye. This assault took place at the D.C.

bureau, and prompted security guards at the building to call the Metropolitan Police Department.

Mr. Lu responded to hearing of this incident by calling Mr. Chen before the police arrived and

telling him that if he insisted on complaining about the assault, Mr. Lu would fire him. Given

this threat, Mr. Chen declined to press charges against Mr. Lai. In response to this vicious attack

on a co-worker, Mr. Lu did nothing. Mr. Lai was not disciplined or suspended, much less fired,

for assaulting a Phoenix employee in the workplace. Mr. Lu's failure to respond to the assault is

consistent with his previous hostility toward Mr. Chen, following his discovery that Mr. Chen

told Plaintiffs Wang, Ren, Chang, and Shue that Mr. Liu said he was going to "clean up"

Plaintiffs for supporting Bingru Wang.

96.     Phoenix executives have allowed other egregious instances of assault to take

place on their property without punishing the individuals involved. In approximately May 2013,

police arrested Phoenix executive Shiping Zeng's son, who works as an anchor in the L.A.

bureau, for assaulting another female anchor at the L.A. bureau. However, the son has continued

to work at Phoenix, without punishment, and Phoenix has since cancelled the victim's program.

97.     In contrast, on July 11, 2013, Mr. Lu threatened Mr. Ren with another warning letter because Mr. Ren failed to answer a phone call at 9:07 P.M. while he was asleep at home. Mr. Ren called Mr. Lu back at approximately 10:00 P.M., and Mr. Lu stated that Mr. Ren must immediately answer him any time he calls.

98.     Mr. Lu's selective hostility toward Mr. Ren, while he ignored outright violations of company policy or criminal law by co-workers who have not complained about the company's practices, also extended to punitive demands for documents to justify use of sick leave.  Mr. Ren suffers from hypertension and hyperthyroidism, conditions which have been exacerbated by the stress that Phoenix has caused Mr. Ren.

99.     Phoenix granted Mr. Ren five days of annual sick leave, yet over the past several months Mr. Lu began contesting every request Mr. Ren made.  When Mr. Ren requested sick leave for June 21, 2013, based on his physician's recommendation that he seek treatment for his hypertension and hyperthyroidism symptoms and would need to avoid workplace stress, Mr. Lu mocked his physician's letter as "unprofessional" and demanded additional evidence of Mr. Ren's symptoms.  When Mr. Ren gave Mr. Lu a lab report showing his high blood pressure and other symptoms, Mr. Lu stated that he did not believe the reports and that an American lab would not be reliable.  He insisted Mr. Ren must produce documentation from his physician.

100.     Attempting to comply with Mr. Lu's unreasonable demand, Mr. Ren visited his endocrinologist to seek a written statement on June 21, 2013.  His physician described Mr. Lu's requests as invasive and refused to produce any personal medical information absent a formal request by Phoenix.

101.     The company's unwarranted and arbitrary scrutiny of Mr. Ren extended beyond

the D.C. bureau.  More than four weeks after Mr. Ren had returned from the Los Angeles trip

and his overtime hours had been submitted to, and approved by, Mr. Lu, Phoenix's H.R.

department in Los Angeles contacted Mr. Ren via e-mail to question the amount of hours

claimed.  The company asserted that after reviewing CCTV footage of Mr. Ren's movements in

the Los Angeles studio — footage spanning five days — Mr. Ren had claimed more hours than

he had spent at the studio.  This was an irrational accusation, given that much of Mr. Ren's time

in Los Angeles had been spent traveling off-site to retrieve supplies for his projects at the studio,

work which would naturally not appear on surveillance footage.

102.    On July 1, 2013, Plaintiffs, through counsel, notified counsel for Phoenix of their

intent to file this Complaint.

103.    On July 18, 2013, one day before the filing of this lawsuit and less than three

weeks after Plaintiffs notified Phoenix of their intent to file suit, Tao Lu, with the explicit

permission of Phoenix management, terminated Mr. Ren's employment.

104.    Mr. Lu approached Mr. Ren at approximately 2:00 P.M. on July 18, 2013, and as

he had repeatedly over the past seven months, angrily demanded to know what Mr. Ren was

doing at that moment.  Mr. Ren explained that he had been assisting with editing video footage, a

responsibility which he takes on to assist the cameramen in the office, including Mr. Lai.  Mr. Lu

demanded that Mr. Ren review with him the footage he had been editing, and then proceeded to

berate Mr. Ren for not cutting enough time off of some of the footage.

105.    Mr. Lu then asked Mr. Ren if he had edited footage from the George Zimmerman

trial for use on that evening's broadcast — an assignment that had never been given to Mr. Ren.

Mr. Lai, as the cameraman assigned to the story, would have been equally responsible for

obtaining and editing the footage.  Mr. Ren explained that he had not edited any tape from the

Zimmerman trial.

106.     Mr. Lu told Mr. Ren that he would give him another written warning for failing to have the tape ready; when Mr. Ren replied that he would not accept a written warning for not performing an assignment that was never assigned to him, Mr. Lu told him he was fired.  From the beginning of their conversation to Mr. Ren's termination, roughly 18 minutes elapsed.

107.     Mr. Lu then sought the approval of senior Los Angeles management to complete the process of terminating Mr. Ren.  Via e-mail, he obtained the approval of Mr. Wu, the CEO of Phoenix in Los Angeles — the same executive who threatened Plaintiffs at a January 2013 meeting — after Mr. Wu consulted with Shiping Zeng— the Los Angeles executive to whom Mr. Wang reported Mr. Liu's misconduct in 2009.

108.     Mr. Lu's constant monitoring Mr. Ren's whereabouts within the office, selective use of warning letters to threaten Mr. Ren's employment, interference with routine employment matters such as use of sick leave already provided for by company policy, preferential treatment for employees who did not raise complaints about Mr. Liu's misconduct, and final termination of his employment, as threatened in October 2012, all have caused severe emotional distress, fear, and panic in Mr. Ren.  Coupled with the termination of Mr. Shue, threats by senior management, and Mr. Lu's tolerance of physical violence against Mr. Chen, a witness against Mr. Liu, this pattern of abuse exacerbated Mr. Ren's high blood pressure and depression.

109.     Since Mr. Ren's termination on July 18, 2013, the company's explanation of why he was fired has continued to change.  When Mr. Ren was fired, the stated basis for discipline was that he had not edited video of the Zimmerman trial, despite not having been assigned to do so, which is a criticism based on performance of job duties.  Yet the company has issued to the press an explanation for the firing, which is that Mr. Ren was fired because he violated the

company's disciplinary policies, which now suggests that he somehow engaged in misconduct during his employment.   Further, on July 29, 2013, both Tao Lu and a commentator sent from Hong Kong, Ningsi Lv, spoke to the D.C. office regarding Mr. Ren's termination.  Mr. Lv stated that the termination was based on the company's employee handbook, and listed 17 different rules that would justify termination, but did not state what provision Mr. Ren had actually violated.  Mr. Lv also referred to the company's public claims regarding Mr. Ren's termination, which would appear to be a claim that Mr. Ren was fired for some sort of workplace misconduct. Since July 18, 2013, the company's explanation for why Mr. Ren was fired has varied from being based on a performance criticism, to an allegation of misconduct that merited discipline, to a generalized assertion that the firing was based on the employee handbook without any citation to the specific rule Mr. Ren purportedly violated.

### (4)  Ching-Yi Chang

110.    Mr. Chang currently serves as the White House correspondent for Phoenix's D.C. bureau, after previously covering financial and economic news.

111.    Like Mr. Ren, Mr. Chang supported Ms. Wang's EEOC charge and as a result was threatened with retaliation by Mr. Liu in October 2012.  He joined Mr. Ren, Mr. Shue, and Mr. Wang in complaining of retaliation to the EEOC on October 15, 2012, and through counsel submitted a letter stating to Phoenix that Mr. Liu's conduct violated the civil rights laws on December 3, 2012.

112.    Like Mr. Ren and Mr. Wang, Mr. Chang was immediately ostracized by his co-workers in the D.C. bureau, and threatened and ordered to obey Mr. Liu by Mr. Yan after Ms. Wang settled her complaint against the company.

113.    Mr. Liu's retaliatory motives were made even clearer to Mr. Chang by Mr. Liu's

perverse view of Ms. Wang's complaint.  Mr. Liu spoke with Mr. Chang shortly after Ms.

Wang's claims were settled, and stated that he knew Mr. Chang had supported Ms. Wang

because of Mr. Liu's advances toward another Phoenix job applicant, Chia-Ling ("Anne") Shih,

a woman that Mr. Liu knew Mr. Chang had dated.  Mr. Liu said that, despite Mr. Chang's

support of Ms. Wang, he "could forgive [Mr. Chang]" if he obeyed him as his superior at the

D.C. bureau.

114.    Mr. Liu also sought to justify eventually firing Mr. Chang by falsely accusing him

of trying to usurp his position as bureau chief.  During the resolution of Ms. Wang's harassment

complaint, Mr. Liu traveled to Hong Kong and insisted that Mr. Chang, who he knew was

supporting Ms. Wang's complaint, fill in as bureau chief in his absence.  He then used this fact to

claim to Hong Kong executives that Mr. Chang was undermining his authority and trying to take

his place, so he would have grounds to terminate him.

115.    Once Mr. Chang filed his charge with the EEOC, Mr. Liu sought to reduce his

role at Phoenix by cutting his assignments and giving a greater share of political coverage to Ms.

Wang.  At the same time, he instructed Mr. Chang to teach another reporter, Jennifer Lee, to take

over Mr. Chang's prior beat: financial news, including coverage of the Treasury Department,

International Monetary Fund, and other major economic institutions.  For example, Mr. Liu

assigned Ms. Wang to cover two out of the three presidential debates, even though Mr. Chang is

a member of the White House Correspondents' Association and covers American politics.  This

pattern of reassigning high-profile and prestigious assignments to other reporters as a form of

punishing Mr. Chang continued even after Mr. Liu's termination in late December 2012 and

replacement by Mr. Lu.

116.    Like Mr. Ren, Mr. Chang was present for the visits from company executives that

followed Mr. Liu's termination and witnessed the threats of retaliation made by Mr. Wu and Mr. Yan.  He was similarly aware of Mr. Shue's prompt termination at the same time Mr. Liu was fired.

117.    Mr. Liu's replacement, Tao Lu, promptly resumed Mr. Liu's practice of reducing Mr. Chang's assignments and on-air presence.

118.    On January 21, 2013, the day of the Presidential Inauguration, every other reporter in the office was given a prime-time segment except for Mr. Chang.  Ms. Wang, in contrast, was assigned a segment for the most high-profile show of the daily news, which airs at noon in China.

119.    Originally, Mr. Lu assigned Mr. Chang to cover all the events on the President's selection of new cabinet members.  He went to the White House to cover the selection of the Secretary of Defense, CIA Director, and the White House Chief of Staff. But on January 22, Mr. Lu assigned Ms. Wang, who had not previously covered any cabinet selection, to do a 30-minute special report on President Obama's choice of cabinet members.

120.    On January 23, as Mr. Chang went to the White House for the briefing on debt limit issues, Mr. Lu assigned Jennifer Lee to cover the White House briefing, even after Mr. Chang informed him that he was already at the White House.  After Mr. Chang went to Mr. Lu for an explanation, he said the other reporter's segment should be arranged to air in the prime time slot, and he asked Mr. Chang to redo the same segment and that it would be aired after prime time.  Mr. Chang's segment aired once, while Ms. Lee's continued to air.

121.     Similarly on February 1, 2013, Mr. Lu refused to allow Mr. Chang to cover the terrorist attack on the U.S. Embassy in Turkey.  When Mr. Chang pointed out that he had been the reporter who previously covered the Middle East, and that the Vice President had already

made a statement, Mr. Lu stated that he had already decided Ms. Lee would cover the event. The

exchange became heated and Mr. Lu said that if Mr. Chang complained further to him about

being treated differently than the other reporters, he would issue a formal warning and report Mr.

Chang's behavior to Hong Kong.

122.    On March 26, 2013, Mr. Lu expressly excluded Mr. Chang from covering the

U.S. response to increasing tensions on the Korean peninsula.  The White House had scheduled a

press briefing on North Korea's threats against South Korea, and Mr. Chang had covered White

House statements about North Korea over the past three years.  Again, Mr. Lu assigned Ms. Lee

rather than Mr. Chang to cover the story.

123.    Mr. Chang objected, prompting an e-mail — written in English — that states that

White House coverage does not necessarily take precedence over the State Department, despite

the obvious importance of covering the U.S. President's official position on a major international

dispute.  Since then, Mr. Lu has assigned virtually all coverage of issues relating to North Korea

to Ms. Wang or Ms. Lee and not Mr. Chang.  Before his complaint to the EEOC in October

2012, Mr. Chang covered this high-profile subject.

124.    When Mr. Chang objected, Mr. Lu responded that he had written the e-mail

specifically so it could be sent to Phoenix's counsel.

125.    On April 1, 2013, Mr. Lu reassigned Mr. Chang's cameraman, Yiqiu Chen, and

replaced him with Mr. Chang's fellow Plaintiff, Mr. Wang.  Mr. Chen is a witness in this case, as

he informed Mr. Chang and the other Plaintiffs that Mr. Liu intended to fire them once Ms.

Wang's sexual harassment case had been settled.  There was no rationale for this transfer, as

Bingru Wang required a new cameraman and Mr. Wang's reporter had recently transferred to

Los Angeles, so he needed to be reassigned.  Instead of matching Ms. Wang and Mr. Wang, Mr.

Lu transferred Mr. Chen to work with Ms. Wang and then paired the two Plaintiffs.  Mr. Chen

was also about to receive a White House press pass, so that he could accompany Mr. Chang to

the White House without having to provide advance notice to the Secret Service for each press

conference.  By removing Mr. Chen, Mr. Lu essentially forced Mr. Chang to restart the process

over again for Mr. Wang, who did not have a White House pass, and would have to go through a

lengthy process to obtain one.

126.    On April 2, 2013, Mr. Lu then demanded that Mr. Chang make copies of his

White House press pass and identify his contacts at the White House, since Mr. Chang is the

only reporter for Phoenix who holds such a pass.  Concerned that Mr. Lu was seeking to transfer

the pass to another reporter or otherwise interfere with his reporting on the White House, Mr.

Chang asked Mr. Lu why he needed copies of the document.  Mr. Lu became agitated and loudly

denounced Mr. Chang for challenging his authority, stating "I can accuse you of whatever I

like."

127.    Mr. Lu's retaliation against Mr. Chang has culminated in a continuing decline in

the number of special assignments that Mr. Chang is assigned.  For the first time in three years,

Mr. Chang did not receive a single live-shot (reporting on-air live) for the entire month of March

and was not assigned to do any special reports for the month of April.

128.    Mr. Chang had covered the International Monetary Fund and World Bank Spring

and Fall meetings for the past two and half years as the lead reporter and interviewed senior

World Bank officials at these events. However, in mid-April 2013, Tao Lu assigned Ms. Wang

and Ms. Lee to cover it, and even hired an additional reporter from outside of the company to

assist, and refused to assign Mr. Chang coverage of the meeting.  Mr. Chang only learned that

Mr. Lu had assigned Ms. Wang, Ms. Lee and the contractor to the story after an internal meeting

where Mr. Lu announced that "it's a done deal" that they would cover it, because they "had discussed it privately."

129.    The use of private meetings outside of the presence of Mr. Chang, Mr. Ren or Mr. Wang is one of the principal means by which Mr. Lu isolates the Plaintiffs from their co-workers and provides a daily reminder to the D.C. office that they are viewed with hostility and suspicion by management.   Mr. Lu also only notifies Ms. Wang, Ms. Lee or Mr. Lai when he will be out of the office or traveling on Phoenix's behalf — Mr. Chang and Mr. Wang usually only find out when Mr. Lu will be changing his work schedule after he's already left the District of Columbia.

130.    Since then, Mr. Lu has begun assigning stories during private meetings with Ms. Lee and Ms. Wang that do not include Mr. Chang.  There has been no explanation for this change.  In late May 2013, Mr. Lu assigned Ms. Wang and Ms. Lee to cover the visit to the U.S. of a prominent Communist Party member and government official, Chee Hwa Tung.  Mr. Chang learned about this high-profile assignment when he saw it aired on Phoenix's news channel.  Mr. Chang had covered Mr. Tung's prior visit in 2012.

131.    Mr. Lu continues to assign the more prestigious and high-profile assignments to Ms. Lee and Ms. Wang, while excluding Mr. Chang from reporting assignments that will likely be well-known news events.  Since June 1, 2013, at least two major news events that were of the sort previously covered by Mr. Chang have been reassigned: the June 11, 2013 visit of the leader of Taiwan's opposition party (despite Mr. Lu's stated policy that Taiwan is Mr. Chang's beat), a reassignment that was expressly approved by senior management in Hong Kong; and the July 10, 2013 U.S.-China Strategic and Economic Dialogue, where Mr. Chang was given only assignments on tangential issues, including Chinese officials' flight arrival and the post-meeting dinner speech.

132.    Mr. Chang is now similarly excluded from reporting 30-minute special segments, which he routinely filmed prior to August 2012, such as a lengthy report on the Gulf oil spill. For example, in August 2013 Ms. Wang was assigned a 30-minute segment — Mr. Chang's status in the D.C. office is now so marginal that he has not even been informed of the assignment's subject.

133.    Phoenix has also sought to change Mr. Chang's employment terms so that he can be subjected to the same arbitrary discipline that Mr. Lu imposed on Mr. Ren.  Mr. Chang has an employment contract with Phoenix, originally signed when he was hired in Taiwan and before he was assigned to the D.C. bureau, which limits the grounds for terminating him to a set of for-cause provisions that require some showing of either gross unprofessional behavior, misconduct or disloyalty to the company.  On April 22, 2013, Mr. Lu attempted to convince Mr. Chang to change his employment status with the company so that he would become an at-will employee and be subject to the employee handbook.  This occurred during the same period when Mr. Lu would invoke the handbook's disciplinary procedures against Mr. Ren, culminating in Mr. Ren's termination on July 18, 2013.

134.    In the aftermath of Mr. Ren's termination, Phoenix sent Ningsi Lv, a commentator from Hong Kong who had also previously served in a managerial role on Phoenix's InfoNews channel, to assist Mr. Lu in managing the D.C. bureau.  At a July 29, 2013 meeting, both Mr. Lu and Mr. Lv spoke to Plaintiffs Chang and Wang along with the rest of the D.C. bureau.  Mr. Lu spoke first, stating that the company would "never yield to unreasonable requests" or tolerate "malicious motivation."  Mr. Lv then addressed Mr. Chang and Mr. Wang directly in front of the entire office regarding the lawsuit and stated that the company had the right to fire Mr. Ren, although as noted at paragraph 109, he did not cite any particular basis for

the termination other than the memorandum distributed throughout Phoenix internally and to the press.

135.     In addition to the interference with Mr. Chang's responsibilities at Phoenix, the harassment and isolation resulting from Mr. Liu and Mr. Lu's conduct, as well as the threats of retaliation from other company executives, have placed Mr. Chang in a near-constant state of anxiety regarding his job, and fear and humiliation regarding his inability to prevent Phoenix from continuing to damage his career.

### (5)  Taofeng Wang

136.     From 2006 through the present, Phoenix has employed Mr. Wang as a cameraman, and Mr. Wang has worked primarily from the company's D.C. bureau, although he did periodically serve as a reporter for the company when needed.  Until Mr. Liu's termination in December 2012, he was Mr. Wang's direct supervisor.

137.     In August or September of 2006, Mr. Liu invited Mr. Wang's wife, Yanhua Sun, to meet him for dinner near the Waldorf Hotel in New York City to discuss job opportunities at Phoenix.  At that time, Mr. Wang had moved to D.C. to work for Phoenix, but his wife still lived in New York and had not yet joined him in D.C.

138.     During the course of the evening, Mr. Liu subjected Ms. Sun to unwanted touching and sexually explicit comments, including the discussion of his Black friend's "gigantic and powerful penis," anal sex, and the proliferation of rape.  Mr. Liu repeatedly told her that he had been good to Ms. Sun's husband as an employee because he liked Ms. Sun and said that he (Mr. Liu) held her husband's job "in his hands."

139.     After dinner, while outside of the Waldorf Hotel, Mr. Liu insisted that Ms. Sun join him in the hotel's lobby to discuss "her husband's job."  When she indicated that she found

this invitation unwelcome, Mr. Liu dragged Mr. Wang's wife inside and forced her to get into an elevator.  Once upstairs, he demanded that she accompany him to his hotel room.  Once there, he locked the door and tried to force himself on her, kissing her and touching himself.  After she pleaded with him to let her leave and stop fondling her, he allowed her to leave.  However, he insisted on walking her to the subway, where he forced her to kiss him.

140.    Mr. Liu renewed his efforts to have sex with Mr. Wang's wife at a lunch in the spring of 2007 and over the phone in early 2008.  During the lunch, he specifically told her that "the rules of the game" were "sex for opportunity."  He had made it clear that whether he would allow Mr. Wang to advance at the company, or hire Ms. Sun, depended on acceding to his sexual advances.  Mr. Liu reiterated these points during a 2008 phone call.

141.    Because Mr. Wang's wife repeatedly and forcefully rejected Mr. Liu's sexual advances, beginning in 2008 Mr. Liu changed Mr. Wang's job responsibilities to include more menial, physical duties, and treated him poorly.  He became colder and less friendly.  For example, Mr. Wang frequently had to build sets and run errands for construction supplies, although Mr. Wang's job duties, as stated in his offer letter from Phoenix, were principally camerawork, assisting with the editing of footage or audio material, or when necessary assisting with the drafting or translation of scripts.  Other employees described Mr. Liu as treating Mr. Wang as his "mule."

142.    As time went on these additional menial duties became increasingly onerous and humiliating.  For example, in November 2011 Mr. Liu required Mr. Wang to singlehandedly move all of the office's furniture and filming equipment for a planned move to the D.C. bureau's current location, working from 7:00 P.M. to 4:00 A.M. the next morning.  When Mr. Wang put in his hours for overtime, they were arbitrarily reduced by Mr. Liu — a regular practice at the

D.C. bureau, *see* paragraphs 161-174.   Both prior to the 2011 move and afterward, Mr. Liu also

routinely required Mr. Wang to purchase new furniture and assemble it, and then when Mr. Liu

decided he disliked the new furniture, disassemble it, return it, and run the errands again.

143.     Mr. Liu would often insist on accompanying Mr. Wang on these errands, during

which time he would make obscene comments about women they saw in public.   In light of how

Mr. Liu had sexually assaulted Mr. Wang's wife, Mr. Wang found these remarks unwelcome,

and disturbing and humiliating, because he was powerless to protect his wife and powerless to

stop Mr. Liu's sexually inappropriate comments.   Mr. Wang's constant sexual remarks also made

Mr. Wang remember how Mr. Liu had assaulted his wife.

144.     Mr. Liu's assault on Mr. Wang's wife caused Mr. Wang's marriage to suffer.   Mr.

Wang's wife resented his failure to protect her from Mr. Liu.   Mr. Wang gradually became more

and more depressed, and at times Mr. Wang and his wife discussed divorce.   Since December

2012, Mr. Wang is being treated with medication for his depression.

145.     In 2009, as noted above in paragraph 29 *supra*, Mr. Wang contacted Shiping

Zeng, a Phoenix executive in the Los Angeles office to report Mr. Liu's sexual assaults against

Mr. Wang's wife, and also discuss Mr. Liu's sexually inappropriate behavior toward female

employees of Phoenix.

146.     Ms. Zeng responded that there was nothing she or anyone else in the L.A. office

would do to take corrective action against Mr. Liu, and that Mr. Wang would have to defend his

wife himself.

147.     Mr. Wang has spent the last four years caught between his employer and his

obligations to his spouse.   Unable to afford to lose his position at Phoenix, he was unable to

defend his wife or speak out to Mr. Liu, which in turn has caused tremendous strain on their

marriage.

148.     In addition to requiring Mr. Wang to perform manual labor not assigned to other employees, Mr. Liu also fabricated accusations of misconduct against Mr. Wang and asked other employees to search his computer and possessions for evidence.  In September 2011, Mr. Liu falsely accused Mr. Wang of selling Phoenix's proprietary news footage to other outlets.  Mr. Wang stated he had never done so, and invited Mr. Liu to review his work to prove it, but Mr. Liu never asked Mr. Wang directly about any specific instances of footage appearing on rival networks.

149.     Mr. Liu then asked cameraman Yiqiu Chen to monitor Mr. Wang's behavior in the office, and in early winter 2012 asked Mr. Ren to search Mr. Wang's computer.  Mr. Ren then explained to Mr. Liu that he had not seen anything out of the ordinary with Mr. Wang's work.   Mr. Liu repeated this request to monitor Mr. Wang several times throughout 2012, asking Mr. Ren about the subject most recently in June 2012.

150.     Mr. Liu then repeated this bald accusation to Mr. Wang in August 2012, again asking him if he were selling company footage to other news outlets, shortly before Ms. Wang filed her sexual harassment complaint against Mr. Liu.

151.     Like Mr. Ren and Mr. Chang, Mr. Wang was threatened by executive Lihong Yan after Ms. Wang settled her harassment complaint against the company in September 2012, and went to the EEOC in October 2012 after he learned of Mr. Liu's plans to retaliate against him.

152.     Mr. Liu's retaliation after Mr. Wang filed his EEOC charge largely took the form of preparing to terminate and replace him. In November 2012, Mr. Liu took the unusual step of hiring Hao Fu the day after he interviewed him, *see* paragraph 69.  Mr. Liu never, in the more than six years Mr. Wang has worked at Phoenix's D.C. office, hired an employee immediately

after an interview.  Mr. Liu then instructed Mr. Fu to do camera and editing work, much like Mr.

Wang's job duties, and stated that he would be more valuable to the company because he can

also serve as a reporter.

153.    During the same period following Mr. Wang's support of Ms. Wang's complaint,

October through December 2012, Mr. Liu ceased assigning reporting duties to Mr. Wang, a

chance consistent with his apparent preference for giving more duties to Mr. Fu.  Previously, Mr.

Wang had regularly served as a reporter when needed, in addition to his primary responsibilities

as a cameraman. A 2011 employment letter described Mr. Wang's title as "reporter/cameraman."

154.    Like Mr. Ren and Mr. Chang, Mr. Wang was subjected to the threats of retaliation

made by Mr. Wu and Mr. Yan in January 2013 after Mr. Liu's termination.  Mr. Wang was

similarly aware of Mr. Shue's prompt termination during the same period when Mr. Liu was

fired.

155.    Like Mr. Ren, Mr. Wang has been subject to arbitrary discipline by Mr. Lu for

alleged performance failings over which he had no control.  Mr. Wang customarily begins work

at the D.C. bureau at or before 9:00 A.M., depending on the assignment, and in February 2013

had agreed to arrive at that time to ensure that staff was on hand to assist with production duties

before 10:00 A.M. when the D.C. bureau would broadcast live interviews.  On February 3, 2013,

Mr. Wang notified Mr. Lu that he would not be available to do so on February 6, 2013, because

he would need to assist with coverage of a speech by then-Defense Secretary Leon Panetta.  At

7:45 A.M., while on-site to cover the speech, Mr. Wang was notified that a guest would be

arriving at the D.C. bureau for an interview.  Mr. Wang informed the show's news editor that he

would not be at the studio and that Mr. Lu would need to assign someone else.

156.    Mr. Lu then contacted Mr. Ren at 8:20 and demanded that he be on-site by 9:15

A.M. to cover the interview; Mr. Ren, unable to arrive in less than an hour, was able to set up the live shot by 9:45.  Mr. Wang was then disciplined for this, in addition to Mr. Ren, with a warning letter stating that the delay in the live shot showed a lack of professionalism.  As in the case of Mr. Ren, Mr. Lu disciplined Mr. Wang despite a lack of any advance notice that he would need to be available on that specific morning.

157.    After Mr. Liu was fired, the company effectively demoted Mr. Wang, while Mr. Lu also isolated Mr. Wang and the other Plaintiffs from the rest of the D.C. office.

158.    Mr. Lu has continued not assigning Mr. Wang reporting assignments, which would give him more public recognition for his work at the company and creative control over broadcast stories than his duties as a cameraman.  Mr. Wang requested an employment status letter in February 2013, but the document that he received only described his title only as "cameraman," not cameraman and reporter.  Mr. Wang asked for an explanation from Human Resources via e-mail, but Phoenix gave none.

159.    Mr. Wang was also, like Mr. Ren, excluded from the reporters' work area in the office by Mr. Lu, ostensibly to prevent "vandalism" of the reporters' equipment — although the underlying vandalism that gave rise to this concern consisted of a missing key from a keyboard.

160.    Mr. Wang, like the other Plaintiffs, works in an environment of unnecessary monitoring and intimidation, and like the other Plaintiffs, has witnessed the company's actions of retaliation against Mr. Shue, Mr. Chang and Mr. Ren, including Defendant's termination of Mr. Shue and Mr. Ren.

### Phoenix's Violation of the Overtime Laws
### and Discrimination on the Basis of National Origin

161.    Mr. Liu's misconduct prior to his termination also extended to his refusal to recognize overtime hours worked by Mr. Ren and Mr. Wang, on the basis of their national origin

(Chinese) and to save Phoenix money.

162.    Phoenix did not, at any time during Mr. Liu's tenure, maintain a record-keeping system for overtime hours other than paper forms submitted by employees and subject to arbitrary revision by Mr. Liu.

163.    Mr. Liu routinely denied or arbitrarily reduced Mr. Wang's overtime claims, and stated on more than one occasion that he was free to do so because Mr. Wang is Chinese and thus easily replaced.  Since 2010, Mr. Wang is aware of approximately two dozen instances of Mr. Liu either verbally instructing him not to claim overtime for his camerawork on-site at news events throughout the United States, or partially rejecting overtime claims without providing any reason for the reduction other than to lower the amount of overtime pay Mr. Wang would receive for hours spent at work.  As of 2012, Mr. Wang's salary was $44,677 per year, or approximately $21.48 per hour assuming a 40-hour work week.

164.    Mr. Wang's employment paperwork with Phoenix describes his position as a "non-exempt" for purposes of the Fair Labor Standards Act.

165.    Mr. Wang worked overtime hours, but was not compensated in the following instances, among others: in May 2012, Defendant refused to recognize approximately 11 hours of overtime over the course of three days in additional preparation for broadcast segments; in June 2012, Defendant refused to pay 16 hours of claimed overtime in additional time spent preparing for broadcast segments; Defendant arbitrarily reduced two to five hours of claimed overtime across the fall of 2011, not including overtime which was never submitted after Mr. Liu stated Phoenix could not accept claims of overtime.

166.    When Mr. Wang asked Mr. Liu why he was reducing or denying his overtime, on several occasions Mr. Liu told him that it was because "you're Chinese, you're supposed to

work," "because you're Chinese, you can be replaced easily," and "Americans are too expensive." Mr. Liu denied Mr. Wang overtime on this explicitly discriminatory basis in May 2012, following Mr. Wang's request for overtime for his assistance in performing studio live-shot exercises at the D.C. bureau throughout that month. He had also done so repeatedly in 2011, notably when Mr. Wang claimed overtime for his assistance in moving the bureau staff into a new office in November 2011.

167.    Mr. Liu repeatedly instructed employees not to submit claims for overtime hours they have worked. On information and belief, this occurred dozens of times since Mr. Wang began working at Phoenix's D.C. office in 2006. Based on a regular pattern of Mr. Liu denying 15 hours of overtime per month on average, Mr. Wang has accrued approximately 435 hours of unpaid overtime over the last three years, a figure which is necessarily an estimate given Mr. Liu's routine practice of verbally instructing employees not to submit requests for overtime.

168.    Calculations of improperly denied overtime are based on a routine practice by Mr. Liu of requiring employees to stay past a standard 10:00 A.M. to 7:00 P.M. schedule for meetings or to work on weekends while simultaneously refusing to grant overtime pay for either additional hours spent in the office or weekend days spent at the office. Rather, grants of overtime pay were treated as a special benefit, rather than being rooted in the hours at the D.C. bureau actually worked. Even when Mr. Liu accepted claims for overtime, he would arbitrarily reduce the hours claimed without reference to the duties performed or the amount of time actually worked.

169.    Mr. Liu similarly denied overtime pay on the basis of national origin to Mr. Ren, the D.C. bureau's broadcast engineer. Mr. Ren's principal job duties were, before he was terminated on July 18, 2013, the maintenance and setup of camera and recording equipment for

filming broadcast segments for the network.  In addition, he was generally tasked with assisting with editing footage and translating scripts, and like Mr. Wang, was a non-exempt employee according to his offer letter.

170.    Since his hire in April 2011, Mr. Ren routinely had to work overtime in order to accommodate the news team's travel schedule and to complete the extensive preparation and editing attendant upon reporting news stories from outside the D.C. studio.  He was paid approximately $47,220 per year, or approximately $22.70 per hour.

171.    Mr. Liu routinely told Mr. Ren either not to claim overtime at all, or that Mr. Liu would arbitrarily reduce his overtime.  Further, his stated reasons for giving Mr. Ren these instructions are based on his national origin, Chinese.  These comments generally took for the form of asserting "because you're Chinese, you can be replaced easily, Americans are too expensive."  Mr. Liu's comments to Mr. Ren were identical to those made to Mr. Wang.  At a minimum, such discriminatory denials with respect to Mr. Ren took place in late May 2012, following Mr. Ren's request for overtime for his work on coverage of the NATO summit in Chicago and in September 2012, following Mr. Ren's request for overtime for his assistance with coverage of the Republican and Democratic National Conventions.

172.    The following are instances where overtime hours were worked but not compensated during Mr. Ren's time at Phoenix to date:  in September 2012, Defendant rejected 10 hours of overtime spent coverage the Democratic National Convention without explanation; Defendant rejected four hours of overtime in late August 2012 from two days in August preparing interview segments; and Defendant rejected approximately 20 hours of overtime in May 2012 from preparing broadcast segments, without explanation.  Defendant refused to recognize an average of fifteen hours of overtime per month.

173.     As with Mr. Wang's employment, Defendant maintained no records as to how many hours Mr. Ren worked.  Based on estimates taken from either instances where overtime was denied to Mr. Ren across the board or instances when it was arbitrarily reduced without explanation, Mr. Ren has worked approximately 230 hours of unpaid overtime since he began work at Phoenix in April 2011.

174.     Mr. Liu's acknowledgment that he was rejecting claimed overtime despite recognizing that the work was performed and that the hours listed would be otherwise correct constituted a willful refusal to honor the company's legal obligation to pay overtime to its non-exempt employees, including Mr. Wang and Mr. Ren.

175.     Before they assisted Ms. Wang with filing her EEOC charge and offering to serve as witnesses on her behalf, Mr. Wang, Mr. Ren, Mr. Chang, and Mr. Shue had served Phoenix for years in their respective capacities  without being cited for performance problems, any form of insubordination, or having their duties significantly altered or reassigned.  Within less than three months of opposing Mr. Liu's unlawful conduct and complaining to the EEOC, Mr. Shue was fired, Mr. Chang's news assignments started being transferred to other reporters, Mr. Wang was stripped of his opportunities to serve as a reporter, and Mr. Ren became subject to increasingly unreasonable and arbitrary workplace discipline only to be terminated less than three weeks after stating his intent to file suit.

## COUNT ONE

### MEIXING REN, CHING-YI CHANG, AND TAOFENG WANG
### AGAINST DEFENDANT FOR
### RETALIATORY HOSTILE WORK ENVIRONMENT
### IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT,
### D.C. Code § 2-1401.01 *et seq.*

176.    Mr. Ren, Mr. Chang, and Mr. Wang restate and incorporate by reference each

paragraph above, as though fully set forth herein, and further state the following:

177.    Phoenix is an employer as that term is defined in the DCHRA, because it

employs, for compensation, individuals who perform work in furtherance of its business,

including Mr. Ren, Mr. Chang, and Mr. Wang, and maintains a place of employment in the

District of Columbia.

178.    Mr. Liu exercised, and Mr. Lu now exercises, managerial authority over

Phoenix's Washington, D.C. bureau.

179.    Plaintiffs Ren, Chang, and Wang engaged in protected activity by supporting Ms.

Wang's filing of an EEOC charge in August 2012, by filing charges with the EEOC themselves

on October 15, 2012, and by complaining to Phoenix, through counsel, about Mr. Liu's

retaliatory threats and harassment of female employees, job candidates and interns on December

3, 2012.

180.    Phoenix, through Mr. Liu and Mr. Yan as its agents, retaliated against Plaintiffs

by threatening their employment.  Mr. Liu stated to Mr. Chen that he intended to terminate the

Plaintiffs' employment once he returned from Hong Kong.  After Mr. Liu returned from Hong

Kong and Ms. Wang's case for sexual assault and harassment had settled, Mr. Yan met with Mr.

Ren, Mr. Chang, and Mr. Wang and directly threatened their employment, asking each of them

whether they wanted to continue working at the company and, when they said yes, directing

them to obey Mr. Liu.

181.    Once Mr. Liu had been terminated in late December 2012, the company retaliated against Plaintiffs through his replacement, Tao Lu, and through Los Angeles executive Xiaoyong Wu.  Mr. Wu expressly threatened Mr. Wang's employment in a January 2013 meeting at the D.C. bureau.

182.    In the seven months since Mr. Lu was installed as bureau chief, he has escalated the retaliation against Plaintiffs Ren, Chang, and Wang, creating a hostile work environment.

183.    Prior to their protected activity, Plaintiffs Ren, Chang, and Wang were invited to meetings to discuss work schedules and plan assignments, as well as social outings with other employees in the D.C. office.  Since November 2012, and in particular since January 2013, they are excluded from social interactions with Mr. Lu and the other employees: Mr. Chang is routinely excluded from meetings to discuss reporting assignments, in which he previously participated; and Mr. Ren was similarly only given access to information from Mr. Lu directly to perform his duties as a broadcast engineer.

184.    Mr. Lu punishes Plaintiffs Ren, Chang, and Wang for purported violations of company policy, while other employees are permitted to violate these same policies on a regular basis.  From January to July 2013, Mr. Lu issued Mr. Ren two disciplinary letters for being late to the office, even as reporter Jennifer Lee and cameraman Dan Lai are permitted to arrive late and leave early without complaint by Mr. Lu.  When Mr. Ren protested the unfairness of this treatment, he was further chastised for "raising his voice" or being "hysterical."  Mr. Chang is similarly threatened with discipline for objecting to the removal of his reporting duties and their reassignment to Ms. Lee and Ms. Wang.

185.    Mr. Lu also perpetuated a hostile work environment against Mr. Ren by making

arbitrary and unreasonable demands regarding his use of medical leave.  On June 18 and 21,

2013, Mr. Ren requested doctor-recommended time off to treat symptoms of hyperthyroidism.

Mr. Lu responded by demanding extensive medical documentation, including lab reports and

other evidence of medical tests, and questioning the integrity of Mr. Ren's physician.

186.    On July 18, 2013, Phoenix terminated Mr. Ren, as set forth in Count Two, which

is further evidence of retaliatory animus.

187.    Since November 2012, Mr. Chang has been repeatedly and regularly denied high-

profile assignments he previously covered as a reporter, while those assignments have been

given to other reporters who have not engaged in protected activity.  This denial of high-profile

assignments and reduction of exposure to the company's viewing audience harms Mr. Chang's

professional reputation and makes him a less recognized reporter and therefore a less marketable

television personality.

188.    After Mr. Liu returned from Hong Kong, he ceased assigning Mr. Wang

reporting duties, as he had prior to August 2012.  In a 2011 letter setting forth Mr. Wang's

employment status, his title was "cameraman/reporter."

189.    The company has effectively demoted Mr. Wang, by changing his job title

without notice.  In a February 2013 employment-status letter, Mr. Wang's title was simply

"cameraman."  Mr. Lu has continued Mr. Liu's practice of not assigning him reporting duties

following Mr. Wang's protected activity.

190.    Mr. Wang has also been present for and witnessed the terminations of Mr. Shue

and Mr. Ren, the reassignment of job duties away from Mr. Chang, and unwarranted discipline

of Mr. Ren that preceded his termination.

191.    As a result of Phoenix's actions, Plaintiffs Wang, Chang, and Ren have suffered

and continue to suffer intangible injuries, including pain, suffering, humiliation and emotional

distress.  Phoenix knew or recklessly disregarded that Mr. Liu's and Mr. Lu's conduct as its

agents violated the DCHRA.

## COUNT TWO

### MEIXING REN, CHING-YI CHANG, AND TAOFENG WANG AGAINST DEFENDANT FOR RETALIATORY HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-1 *et seq.*

192.    Mr. Ren, Mr. Chang, and Mr. Wang restate and incorporate by reference each

paragraph above, as though fully set forth herein, and further state the following:

193.    Phoenix is an employer as that term is defined in Title VII, because it employed

and employs, for compensation, individuals who perform work in furtherance of its business,

including Mr. Ren, Mr. Chang, and Mr. Wang, and employs more than 15 people.

194.    Mr. Liu exercised, and Mr. Lu now exercises, managerial authority over

Phoenix's Washington, D.C. bureau.

195.    Plaintiffs Ren, Chang, and Wang engaged in protected activity by supporting Ms.

Wang's filing of an EEOC charge in August 2012, by filing charges with the EEOC themselves

on October 15, 2012, and by complaining to Phoenix, through counsel, about Mr. Liu's

retaliatory threats and harassment of female employees, job candidates and interns on December

3, 2012.

196.    Phoenix, through Mr. Liu and Mr. Yan as its agents, retaliated against Plaintiffs

by threatening their employment.  Mr. Liu stated to Mr. Chen that he intended to terminate the

Plaintiffs' employment once he returned from Hong Kong.  After Mr. Liu returned from Hong

Kong and Ms. Wang's case for sexual assault and harassment had settled, Mr. Yan met with Mr.

Ren, Mr. Chang, and Mr. Wang and directly threatened their employment, asking each of them whether they wanted to continue working at the company and, when they said yes, directing them to obey Mr. Liu.

197.    Once Mr. Liu had been terminated in late December 2012, the company retaliated against Plaintiffs through his replacement, Tao Lu, and through Los Angeles executive Xiaoyong Wu.  Mr. Wu expressly threatened Mr. Wang's employment in a January 2013 meeting at the D.C. bureau.

198.    In the seven months since Mr. Lu was installed as bureau chief, he has escalated the retaliation against Plaintiffs Ren, Chang, and Wang, creating a hostile work environment.

199.    Prior to their protected activity, Plaintiffs Ren, Chang, and Wang were invited to meetings to discuss work schedules and plan assignments, as well as social outings with other employees in the D.C. office.  Since November 2012, and in particular since January 2013, they are excluded from social interactions with Mr. Lu and the other employees: Mr. Chang is routinely excluded from meetings to discuss reporting assignments, in which he previously participated; and Mr. Ren was similarly only given access to information from Mr. Lu directly to perform his duties as a broadcast engineer.

200.    Mr. Lu punishes Plaintiffs Ren, Chang, and Wang for purported violations of company policy, while other employees are permitted to violate these same policies on a regular basis.  From January to July 2013, Mr. Lu issued Mr. Ren two disciplinary letters for being late to the office, even as reporter Jennifer Lee and cameraman Dan Lai are permitted to arrive late and leave early without complaint by Mr. Lu.  When Mr. Ren protested the unfairness of this treatment, he was further chastised for "raising his voice" or being "hysterical."  Mr. Chang is similarly threatened with discipline for objecting to the removal of his reporting duties and their

reassignment to Ms. Lee and Ms. Wang.

201.    Mr. Lu also perpetuated a hostile work environment against Mr. Ren by making arbitrary and unreasonable demands regarding his use of medical leave.  On June 18 and 21, 2013, Mr. Ren requested doctor-recommended time off to treat symptoms of hyperthyroidism. Mr. Lu has responded by demanding extensive medical documentation, including lab reports and other evidence of medical tests, and questioning the integrity of Mr. Ren's physician.

202.    On July 18, 2013, Phoenix terminated Mr. Ren, as set forth in Count Two, which is further evidence of retaliatory animus.

203.    Since November 2012, Mr. Chang has been repeatedly and regularly denied high-profile assignments he previously covered as a reporter, while those assignments have been given to other reporters who have not engaged in protected activity.  This denial of high-profile assignments and reduction of exposure to the company's viewing audience harms Mr. Chang's professional reputation and makes him a less recognized reporter and therefore a less marketable television personality.

204.    After Mr. Liu returned from Hong Kong, he ceased assigning Mr. Wang reporting duties, as he had prior to August 2012.  In a 2011 letter setting forth Mr. Wang's employment status, his title was "cameraman/reporter."

205.    The company has effectively demoted Mr. Wang, by changing his job title without notice.  In a February 2013 employment-status letter, Mr. Wang's title was simply "cameraman."  Mr. Lu has continued Mr. Liu's practice of not assigning him reporting duties following Mr. Wang's protected activity.

206.    Mr. Wang has also been present for and witnessed the terminations of Mr. Shue and Mr. Ren, the reassignment of job duties away from Mr. Chang, and unwarranted discipline

of Mr. Ren that preceded his termination.

207.     As a result of Phoenix's actions, Plaintiffs Wang, Chang, and Ren have suffered and continue to suffer intangible injuries, including pain, suffering, humiliation and emotional distress.  Phoenix knew or recklessly disregarded that Mr. Liu's and Mr. Lu's conduct as its agents violated Title VII.

208.     On July 30 and 31, 2013, the EEOC issued Notices of Right to Sue to Mr. Ren, Mr. Wang, and Mr. Chang.

## COUNT THREE

### MEIXING REN AGAINST DEFENDANT FOR RETALIATORY TERMINATION IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT, D.C. Code § 2-1401.01 *et seq.*

209.     Mr. Ren restates and incorporates each paragraph as though fully stated herein.

210.     Mr. Liu exercised, and Mr. Lu now exercises, managerial authority over Phoenix's Washington, D.C. bureau.

211.     Phoenix is an employer as that term is defined in the DCHRA, because it employs, for compensation, individuals who perform work in furtherance of its business, including Mr. Ren, and maintains a place of employment in the District of Columbia.

212.     Phoenix's manager, Tao Lu, replaced Mr. Liu and continued to threaten and harass Mr. Ren with unwarranted discipline and arbitrary, often punitive workplace demands, including requiring daily reports for no apparent purpose, forcing Mr. Ren to produce large amounts of medical documentation to use sick leave, and issuing written warnings over trivial matters while other employees were free to violate company policies with impunity.

213.     On July 18, 2013, Mr. Lu terminated Mr. Ren's employment, with the specific

approval of senior company executives in Los Angeles, due to Mr. Ren's alleged failure to perform a task he was never assigned in the first place.

214.     Phoenix terminated Mr. Ren's employment less than three weeks after he notified Phoenix, through counsel, of his intent to file suit to stop the ongoing retaliatory harassment.

215.     Phoenix was on notice that, and recklessly disregarded, Mr. Ren was being subject to retaliatory threats and harassment by Phoenix managers, and instead ratified their conduct by terminating Mr. Ren in retaliation for his protected activities in October and December 2012.

## COUNT FOUR

### CHING-YI CHANG AGAINST DEFENDANT FOR RETALIATION IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT, D.C. Code § 2-1401.01 *et seq.*

216.     Plaintiff restates and incorporates each paragraph above as though fully stated herein.

217.     In the alternative, Phoenix's reduction of Mr. Chang's on-air assignments and reassignment of prestigious or high-profile coverage to other reporters constitutes retaliation.

218.     Mr. Liu, after Mr. Chang engaged in the protected activities of supporting Ms. Wang's EEOC complaint, and then filing his own complaint in response to Mr. Liu's threats of retaliation, immediately began reassigning high-profile political coverage to other reporters.  Mr. Chang, as a veteran financial affairs and political reporter, and the company's White House correspondent, was clearly more qualified for these assignments.

219.     Mr. Lu, after replacing Mr. Liu, continued this trend of expressly favoring other reporters, and throughout 2013 reassigned stories away from Mr. Chang that he had traditionally covered.

220.     As a result, Mr. Chang's presence on the air dropped noticeably, with fewer and fewer stories airing that featured Mr. Chang throughout the spring of 2013 and continuing to the present.

221.     This reduction in assignments has never been explained by any reference to Mr. Chang's performance or abilities.  It has the effect of decreasing his public profile as a TV news personality, which in turn harms his professional prestige.

222.     As a result of this retaliatory reduction in high-profile assignments, Mr. Chang has experience emotional distress, anxiety and humiliation, in addition to a loss of professional prestige as his on-air presence diminishes.  Phoenix knew or recklessly disregarded that its conduct through its agents violated the D.C. Human Rights Act.

### COUNT FIVE

**CHING-YI CHANG AGAINST DEFENDANT FOR RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-1 *et seq.***

223.     Plaintiff restates and incorporates each paragraph above as though fully stated herein.

224.     In the alternative, Phoenix's reduction of Mr. Chang's on-air assignments and reassignment of prestigious or high-profile coverage to other reporters constitutes retaliation.

225.     Mr. Liu, after Mr. Chang engaged in the protected activities of supporting Ms. Wang's EEOC complaint, and then filing his own complaint in response to Mr. Liu's threats of retaliation, immediately began reassigning high-profile political coverage to other reporters.  Mr. Chang, as a veteran financial affairs and political reporter, and the company's White House correspondent, was clearly more qualified for these assignments.

226.     Mr. Lu, after replacing Mr. Liu, continued this trend of expressly favoring other

reporters, throughout 2013 reassigned stories away from Mr. Chang that he had traditionally covered.

227.    As a result, Mr. Chang's presence on the air dropped noticeably, with fewer and fewer stories airing that featured Mr. Chang throughout the spring of 2013 and continuing to the present.

228.    This reduction in assignments has never been explained by any reference to Mr. Chang's performance or abilities.  It has the effect of decreasing his public profile as a TV news personality, which in turn harms his professional prestige.

229.    As a result of this retaliatory reduction in high-profile assignments, Mr. Chang has experience emotional distress, anxiety and humiliation, in addition to a loss of professional prestige as his on-air presence diminishes. Phoenix knew or recklessly disregarded that its conduct through its agents violated Title VII.

230.    On July 31, 2013, the EEOC issued a right-to-sue notice to Mr. Chang.

## COUNT SIX

### TAOFENG WANG AGAINST DEFENDANT
### FOR RETALIATION IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT,
### D.C. Code § 2-1401.01 *et seq.*

231.    Mr. Wang restates and incorporates by reference each paragraph above as though fully stated herein.

232.    In the alternative, Mr. Wang has suffered retaliation in the form of a demotion, in that his title was changed and his job duties altered because he engaged in the protected activities of assisting Ms. Wang with her EEOC charge, filing his own EEOC charge, and objecting to Phoenix's unlawful conduct through counsel in a December 3, 2012 letter.

233.    Mr. Liu exercised, and Mr. Lu now exercises, managerial authority over

Phoenix's Washington, D.C. bureau.

234.    Upon Mr. Liu's return from Hong Kong in October 2012, he immediately ceased assigning Mr. Wang duties as a reporter; previously, Mr. Wang had routinely been sent into the field to both shoot stories as a cameraman and appear on camera to report as a foreign correspondent for Phoenix.

235.    Serving as a reporter is a more prestigious job function than serving as a cameraman, because reporters are recognized by the viewing public and enjoy greater creative control over the content of broadcasts than cameramen.

236.    The company has effectively demoted Mr. Wang, by changing his job title without notice.  In a February 2013 employment-status letter, Mr. Wang's title was simply "cameraman."

237.    Since January 2013, when he replaced Mr. Liu, Mr. Lu has continued Mr. Liu's practice of not assigning Mr. Wang reporter duties following Mr. Wang's protected activity.

238.    The company has not given Mr. Wang any explanation for the change in job title or duties.

239.    This reduction in responsibilities and title has harmed Mr. Wang professionally and contributed to his depression, which has been exacerbated by the company's retaliation against him.  As a result, Mr. Wang has suffered increased feelings of depression and humiliation.

240.    Phoenix was on notice that its agents, particularly Mr. Liu, were retaliating against Mr. Wang, and yet has permitted this reduction of job responsibilities to continue.  Phoenix has therefore known and recklessly disregarded that its conduct violates the D.C. Human Rights Act.

## COUNT SEVEN

### HAIPEI SHUE AGAINST DEFENDANT.
### FOR RETALIATORY TERMINATION IN VIOLATION OF THE
### D.C. HUMAN RIGHTS ACT, D.C. Code § 2-1401.01 *et seq.*

241.    Plaintiff restates and incorporates by reference each paragraph above, as though fully set forth herein, and further states the following:

242.    Mr. Shue was an employee of Phoenix, because the company exercised direct control over his daily work responsibilities, including over the content of his commentary segments, he was invited to the same meetings as other employees, and shared workspace with other employees.

243.    In late August 2012, Mr. Shue responded to Ms. Wang's complaint of sexual harassment and assault by Mr. Liu by accompanying her to the EEOC to file a charge.

244.    As a result of her complaint, Mr. Liu was sent to Hong Kong for approximately two to three weeks while the company settled Ms. Wang's claims.

245.    Upon Mr. Liu's return, he stated to cameraman Yiqiu Chen that he intended to "clean up" Mr. Shue, Mr. Ren, Mr. Wang, and Mr. Chang.

246.    In response to this threat of termination, Mr. Shue and the other Plaintiffs went to the EEOC District of Columbia field office on October 15, 2012 to discuss filing charges against Phoenix.

247.    Notice of Mr. Shue and the other Plaintiffs' contact with the EEOC was sent to the company during the period between October 16 and 25, 2012.

248.    On October 24, 2012, Mr. Shue retained counsel, and on December 3, 2012, sent to Phoenix through counsel a letter discussing Mr. Liu's threats of retaliation and harassment of female employees, interns and job candidates.

249.     On December 26, 2012, Mr. Shue was informed by Mr. Liu's replacement, Tao Lu, that he was being terminated.  Mr. Lu stated that a programming review was leading to changes across all of Phoenix's foreign bureaus in the United States, Europe and elsewhere.

250.     To date, no other bureau's programming has been changed in a way that result in a commentator being dismissed, and commentary is still featured on Phoenix's news coverage of the United States.

251.     After Mr. Shue's termination, the company initially relied on reporters to provide daily commentary, but from March 2013 to July 2013, began using two regular commentators who replaced Mr. Shue. In July 2013, the company resumed filming commentary at the D.C. bureau with a new commentator, after hosting commentary from Hong Kong from January through July 2013.

252.     Despite being placed on notice that Mr. Liu was threatening Mr. Shue with retaliation, both through the EEOC notice and via counsel's letter of December 3, 2012, the company instead ratified his unlawful conduct and terminated Mr. Shue.  Phoenix has therefore known and recklessly disregarded that its conduct violates the D.C. Human Rights Act.

## COUNT EIGHT

**HAIPEI SHUE AGAINST DEFENDANT
FOR RETALIATORY TERMINATION IN VIOLATION OF
TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
42 U.S.C. § 2000e-1 *et seq.***

253.     Plaintiff restates and incorporates by reference each paragraph above, as though fully set forth herein, and further states the following:

254.     Mr. Shue was an employee of Phoenix, because the company exercised direct control over his daily work responsibilities, including over the content of his commentary

segments, he was invited to the same meetings as other employees, and shared workspace with other employees.

255.    In late August 2012, Mr. Shue responded to Ms. Wang's complaint of sexual harassment and assault by Mr. Liu by accompanying her to the EEOC to file a charge.

256.    As a result of her complaint, Mr. Liu was sent to Hong Kong for approximately two to three weeks while the company settled Ms. Wang's claims.

257.    Upon Mr. Liu's return, he stated to cameraman Yiqiu Chen that he intended to "clean up" Mr. Shue, Mr. Ren, Mr. Wang, and Mr. Chang.

258.    In response to this threat of termination, Mr. Shue and the other Plaintiffs went to the EEOC District of Columbia field office on October 15, 2012 to discuss filing charges against Phoenix.

259.    Notice of Mr. Shue and the other Plaintiffs' contact with the EEOC was sent to the company during the period between October 16 and 25, 2012.

260.    Mr. Liu responded to Mr. Shue's support of Ms. Wang's EEOC complaint by refusing to pay him for his work as a commentator in October 2012, stating that the company lacked the budgeted funds to pay Mr. Shue through the remainder of the year.  Mr. Liu ultimately paid Mr. Shue, after approximately six weeks, stating that he was doing so as a favor.  Mr. Shue confirmed with Los Angeles personnel during that period that there was no lack of funds in the budget.

261.    On October 24, 2012, Mr. Shue retained counsel, and on December 3, 2012, sent to Phoenix through counsel a letter discussing Mr. Liu's threats of retaliation and harassment of female employees, interns and job candidates.

262.    On December 26, 2012, Mr. Shue was informed by Mr. Liu's replacement, Tao

Lu, that he was being terminated.  Mr. Lu stated that a programming review was leading to

changes across all of Phoenix's foreign bureaus in the United States, Europe and elsewhere.

263.    To date, no other bureau's programming has been changed in a way that result in

a commentator being dismissed, and commentary is still featured on Phoenix's news coverage of

the United States.

264.    After Mr. Shue's termination, the company initially relied on reporters to provide

daily commentary, but from March 2013 to July 2013, used two regular commentators who

replaced Mr. Shue. In July 2013, the company resumed filming commentary at the D.C. bureau

with a new commentator, after hosting commentary from Hong Kong from January through July

2013.

265.    Despite being placed on notice that Mr. Liu was threatening Mr. Shue with

retaliation, both through the EEOC notice to the company and via counsel's letter of December

3, 2012, the company instead ratified his unlawful conduct and terminated Mr. Shue.  Phoenix

has therefore known and recklessly disregarded that its conduct violates Title VII.

266.    On June 23, 2013, the EEOC issued a right-to-sue notice to Mr. Shue.

### COUNT NINE

**TAOFENG WANG AGAINST DEFENDANT
FOR ASSOCIATIONAL RETALIATORY HOSTILE WORK ENVIRONMENT IN
VIOLATION OF THE D.C. HUMAN RIGHTS ACT,
D.C. Code § 2-1401.01 *et seq***

267.    Plaintiff restates and incorporates by reference each paragraph above, as though

fully set forth herein, and further states the following:

268.    Phoenix is an employer as that term is defined in the DCHRA, because it directs

Mr. Wang's work and compensates him for work performed in furtherance of the company's

business, and Phoenix maintains a place of employment in the District of Columbia.

269.    Mr. Liu exercised managerial authority over Phoenix's East Coast bureaus, in particular the company's offices in New York City and Washington, D.C., including the authority to interview, hire and terminate Phoenix interns and permanent employees.

270.    Mr. Liu attempted to coerce Mr. Wang's spouse, Yanhua Sun, into having sex with him in exchange for a job with Phoenix and favorable treatment of Mr. Wang as a Phoenix employee.  Mr. Liu stated this explicitly, during a 2008 phone call with Ms. Sun, and implicitly at a fall 2006 dinner, where he described holding Mr. Wang's job "in his hands" and then attempted to physically force Ms. Sun to submit to his sexual advances.

271.    After Ms. Sun rejected Mr. Liu's advances, Mr. Liu began assigning Mr. Wang more menial tasks and physical labor, a pattern that persisted from 2008 until Mr. Liu's termination in December 2012.

272.    In August 2009, Mr. Wang complained about Mr. Liu's treatment of his wife and other female employees to Shiping Zeng, a Phoenix executive at the company's Los Angeles headquarters.  Despite being placed on notice of Mr. Liu's unlawful behavior, Ms. Zeng took no corrective action, and stated that the company would not do anything to stop Mr. Liu.

273.    Mr. Liu frequently insisted on accompanying Mr. Wang on the menial errands he would assign him, and make obscene comments about women he saw during these trips.  Mr. Wang had to endure hearing his supervisor, who had sexually assaulted his wife, make lewd comments about other women as a regular condition of working for Mr. Liu.

274.    Mr. Liu singled Mr. Wang out for tasks such as set construction that he did not assign other cameramen or reporters at the D.C. bureau, such that the other employees described him as Mr. Liu's "mule."

275.     Mr. Liu changed the conditions of Mr. Wang's job to punish him and his spouse for her refusal to sleep with Mr. Liu, making his job degrading and more difficult.

276.     As a result, Mr. Wang experienced increasing feelings of depression and hopelessness, as well as anxiety over the future of his marriage.  His wife resented his failure to oppose Mr. Liu's conduct, and their marriage became increasingly strained, leading them to discuss divorce.

277.     Phoenix knew, based on Mr. Wang's complaint to Ms. Zeng, that Mr. Liu was engaging in sexually aggressive and unlawful behavior toward female job candidates and employees, yet allowed Mr. Liu to continue punishing Mr. Wang for his Ms. Sun's refusal to sleep with Mr. Liu.

## COUNT TEN

### TAOFENG WANG AGAINST DEFENDANT FOR ASSOCIATIONAL RETALIATORY HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-1 *et seq.*

278.     Plaintiff restates and incorporates by reference each paragraph above, as though fully set forth herein, and further states the following:

279.     Phoenix is an employer as that term is defined in Title VII, because it directs Mr. Wang's work and compensates him for work performed in furtherance of the company's business, and Phoenix employs more than 15 people in the United States.

280.     Mr. Liu exercised managerial authority over Phoenix's East Coast bureaus, in particular the company's offices in New York City and Washington, D.C., including the authority to interview, hire and terminate Phoenix interns and permanent employees.

281.     Mr. Liu attempted to coerce Mr. Wang's spouse, Yanhua Sun, into having sex

with him in exchange for a job with Phoenix and favorable treatment of Mr. Wang as a Phoenix employee.  Mr. Liu stated this explicitly, during a 2008 phone call with Ms. Sun, and implicitly at a fall 2006 dinner, where he described holding Mr. Wang's job "in his hands" and then attempted to physically force Ms. Sun to submit to his sexual advances.

282.    After Ms. Sun rejected Mr. Liu's advances, Mr. Liu began assigning Mr. Wang more menial tasks and physical labor, a pattern that persisted from 2008 until Mr. Liu's termination in December 2012.

283.    In August 2009, Mr. Wang complained about Mr. Liu's treatment of his wife and other female employees to Shiping Zeng, a Phoenix executive at the company's Los Angeles headquarters.  Despite being placed on notice of Mr. Liu's unlawful behavior, Ms. Zeng took no corrective action, and stated that the company would not do anything to stop Mr. Liu.

284.    Mr. Liu frequently insisted on accompanying Mr. Wang on the menial errands he would assign him, and make obscene comments about women he saw during these trips.  Mr. Wang had to endure hearing his supervisor, who had sexually assaulted his wife, make lewd comments about other women as a regular condition of working for Mr. Liu.

285.    Mr. Liu singled Mr. Wang out for tasks such as set construction that he did not assign other cameramen or reporters at the D.C. bureau, such that the other employees described him as Mr. Liu's "mule."

286.    Mr. Liu changed the conditions of Mr. Wang's job to punish him and his spouse for her refusal to sleep with Mr. Liu, making his job degrading and more difficult.

287.    As a result, Mr. Wang experienced increasing feelings of depression and hopelessness, as well as anxiety over the future of his marriage.  His wife resented his failure to oppose Mr. Liu's conduct, and their marriage became increasingly strained, leading them to

discuss divorce.

288.     Phoenix knew, based on Mr. Wang's complaint to Ms. Zeng, that Mr. Liu was

engaging in sexually aggressive and unlawful behavior toward female job candidates and

employees, yet allowed Mr. Liu to continue punishing Mr. Wang for his Ms. Sun's refusal to

sleep with Mr. Liu.

289.     On July 31, 2013, the EEOC issued a right-to-sue notice to Mr. Wang.

### COUNT ELEVEN

### FANGYUAN LIU AGAINST DEFENDANT
### FOR BATTERY UNDER THE COMMON LAW

290.     Ms. Liu restates and incorporates by reference each paragraph above, as though

fully set forth herein, and further states the following:

291.     Mr. Liu exercised managerial authority over Phoenix's Washington, D.C. bureau,

and selected Ms. Liu for the internship at the D.C. bureau.

292.     While acting as the company's agent and supervising Ms. Liu during her

internship, Mr. Liu repeatedly invited Ms. Liu to join him in Atlantic City, where neither other

employees nor his wife would be present.  Ms. Liu persistently declined these invitations.

293.     While acting as the company's agent, Mr. Liu invited Ms. Liu to meet with him

for lunch at the cafeteria in the bureau's office building, where he repeatedly made obscene

comments regarding sex.  Ms. Liu did not participate in this conversation.  On the way back to

the office, Mr. Liu placed his arm around Ms. Liu and pulled her toward him.  Ms. Liu attempted

to avoid him after this incident.

294.     During the final week of her internship, on or about August 7, 2012, Mr. Liu

again touched Ms. Liu in an unwelcome and sexually aggressive manner.  While Ms. Liu

demonstrated a piece of news coverage she had edited to Mr. Liu in his office, he reached out and grabbed Ms. Liu's thigh and began pulling her toward him, stating "come to me." She resisted and left the office.  This incident occurred during work hours, in Mr. Liu's office at the bureau, and took place during a discussion premised on his authority as Defendant's bureau chief.

295.    Mr. Liu, acting as Phoenix's agent, touched Ms. Liu on at least two occasions under circumstances where a reasonable person would not believe he had consent to do so, and in the context of unwelcome sexual advances that would be offensive to any reasonable person.

296.    Phoenix was aware, as of the fall of 2009 when Mr. Wang complained to Los Angeles executive Ms. Zeng, that Mr. Liu engaged in unwelcome sexual, physical advances against female employees under his supervision, yet did not remove his authority or prevent him from engaging in battery against future employees and interns.  Phoenix's failure to prevent Mr. Liu's tortious conduct demonstrates both recklessness as to the intentional torts of its agents and acquiescence in Mr. Liu's behavior as part of his managerial authority.

### COUNT TWELVE

### FANGYUAN LIU AGAINST DEFENDANT
### FOR NEGLIGENT HIRING AND RETENTION UNDER THE COMMON LAW

297.    Ms. Liu restates and incorporates by reference each paragraph above, as though fully set forth herein, and further states the following:

298.    Phoenix hired Mr. Liu to serve as the North American bureau chief and gave him authority to hire, terminate, and directly supervise the employees in the New York City and Washington D.C. offices.

299.    Phoenix was placed on notice in August 2009, when Mr. Wang told Ms. Zeng that

Mr. Liu was sexually harassing and offensively touching female employees and job candidates at the offices under his supervision.

300.    Despite being placed on notice that Mr. Liu was engaging in sexual harassment in violation of federal and state civil rights laws, and committing the tort of battery, all while wielding authority granted to him by the company, Phoenix continued to retain Mr. Liu in his supervisory role.

301.    Mr. Liu interviewed and selected Ms. Liu for an internship in the spring of 2012, after Phoenix had been placed on notice regarding his unlawful conduct.

302.    Because Phoenix did not remove Mr. Liu from his position of authority prior to Ms. Liu's internship, he was able to commit the tort of battery against Ms. Liu on at least two occasions in July and August 2012, using his authority as a Phoenix employee and control over Phoenix's D.C. bureau to engage in that tortious conduct.

303.    Phoenix knew or should have known that its failure to terminate Mr. Liu when it was informed of his physical and sexual aggression against female employees.

304.    Phoenix's prior knowledge of Mr. Liu's behavior, and failure for more than three years to address or correct that behavior, demonstrates reckless disregard for the company's obligations under  statutory and common law and acquiescence in Mr. Liu's behavior as part of his managerial authority.

## COUNT THIRTEEN

### MEIXING REN AND TAOFENG WANG AGAINST DEFENDANT FOR VIOLATION OF THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 201 *et seq.*

305.    Plaintiffs Ren and Wang restate and incorporate by reference each paragraph above, as though fully set forth herein, and further states the following:

306.    Phoenix is an employer under the Fair Labor Standards Act, in that it directs Mr.
Ren and Mr. Wang's work performed on its behalf and compensates them for that work.

307.    Mr. Ren and Mr. Wang are non-exempt employees under the Act, because their
duties are neither executive, creative, nor administrative in nature; Mr. Ren worked as a
broadcast engineer, and Mr. Wang worked primarily as a cameraman.

308.    Mr. Ren and  Mr. Wang are described as non-exempt, and therefore eligible for
overtime pay, in Phoenix's documents describing their employment status, including their offer
letters of employment.

309.    Mr. Liu, acting as Phoenix's agent, repeatedly refused to accept written accounts
of overtime hours worked over the past three years.  Phoenix does not maintain any system for
tracking hours worked for the purpose of overtime claims, other than paper forms submitted to
Phoenix management.

310.    Even when paper forms were submitted, Mr. Liu would arbitrarily reduce or deny
the hours claimed, and did so expressly on the basis of national origin — such as "you're
Chinese, you're supposed to work hard" and "Americans are too expensive."

311.    Mr. Liu never denied that work was performed. Instead, his denials were based on
saving Phoenix money on labor costs.

312.    As a result, Mr. Ren has accrued approximately 230 hours of unpaid overtime
during Mr. Liu's tenure as bureau chief since April 2011.  Mr. Wang has accumulated
approximately 435 hours of unpaid overtime since July 2010.  As a result, Mr. Ren and Mr.
Wang have each suffered economic losses.

313.    Mr. Liu's express refusal to accept overtime claims, while acknowledging that
compensable work had been performed, constituted a willful violation of the Act, with respect to

both Mr. Ren and Mr. Wang.

314.    Phoenix knew or recklessly disregarded that permitting Mr. Liu to arbitrarily

control overtime pay claims, and the company's failure to keep objective records, violated the

Act.

## COUNT FOURTEEN

**MEIXING REN AND TAOFENG WANG AGAINST DEFENDANT FOR NATIONAL
ORIGIN DISCRIMINATION
IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
42 U.S.C. § 2000e-1 *et seq.***

315.    Mr. Ren and Mr. Wang are protected on the basis of national origin under Title

VII because they are both of Chinese national origin.

316.    Phoenix is an employer as defined under Title VII because it employs more than

15 people in its operations in the United States.

317.    Mr. Liu exercised supervisory authority over Plaintiffs Ren and Wang on behalf

of Phoenix

318.    Mr. Liu discriminated against Plaintiffs Ren and Wang on the basis of national

origin by invoking their national origin as a basis for denying their otherwise valid claims for

overtime compensation, including such comments as "you're Chinese, you're supposed to work

hard" and "Americans are too expensive," which were made in conjunction with verbal denials

of claimed overtime or instructions not to submit claims for overtime pay.

319.    At a minimum, such discriminatory denials with respect to Mr. Ren took place in

late May 2012, following Mr. Ren's request for overtime for his work on coverage of the NATO

summit in Chicago and in September 2012, following Mr. Ren's request for overtime for his

assistance with coverage of the Republican and Democratic National Conventions.  For Mr.

Wang, Mr. Liu denied overtime on an explicitly discriminatory basis in May 2012, following Mr.

Wang's request for overtime for his assistance in performing studio live-shot exercises at the D.C. bureau throughout that month.

320.     Phoenix knew or recklessly disregarded that Mr. Liu's conduct as its agent violated Title VII.

321.     On July 30 and 31, 2013, the EEOC issued Notices of Right to Sue to Mr. Ren and Mr. Wang, respectively.

## COUNT FIFTEEN

### FANGYUAN LIU AGAINST DEFENDANT
### FOR DICRIMINATION BASED ON SEX
### IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT,
### D.C. Code § 2-1401.01 *et seq.*

322.     Ms. Liu restates and incorporates by reference each paragraph above, as though fully set forth herein, and further states the following:

323.     The District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.* prohibits discrimination against an employee on the basis of sex, including *quid pro quo* and hostile work environment sexual harassment.

324.     Defendant is an employer as defined in § 2-1401.02 of the D.C. Code.

325.     Ms. Liu, a former unpaid intern for Defendant, is an employee as defined in § 2-1401.02(9) of the D.C. Code, which provides that "the term 'employee' shall include an unpaid intern."

326.     Mr. Liu exercised managerial authority over Phoenix's Washington, D.C. bureau, and selected Ms. Liu for the internship at the D.C. bureau.

327.     Defendant is liable for subjecting Ms. Liu to a sexually hostile work environment. While acting as the company's agent and supervising Ms. Liu during her internship, Mr. Liu

repeatedly subjected Plaintiff Liu to sexual comments, unwanted touching, and inappropriate invitations to join him in Atlantic City, where neither other employees nor his wife would be present.

328.    Ms. Liu made it clear to Mr. Liu that his conduct was unwelcome by rejecting his invitations to Atlantic City, rebuffing his advances, and avoiding him in the workplace.

329.    The sexually hostile environment created by Mr. Liu was severe and pervasive. As a result of Mr. Liu's sexual harassment, Plaintiff Liu avoided contact with all male coworkers and ended her internship one week earlier than planned.  Following her experience, she seriously reconsidered pursuing journalism as a profession.

330.    Because Phoenix had been placed on notice in August 2009 that Mr. Liu engaged in sexual harassment of female employees and job candidates, Phoenix knew or recklessly disregarded that Mr. Liu's conduct as its agent toward Plaintiff Liu violated the DCHRA.

## JURY TRIAL DEMANDED

Pursuant to Rule 38, Fed. R. Civ. P., Plaintiffs demand trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant them the following relief:

1.    A declaratory judgment stating that Defendant's recordkeeping policies violate the FLSA;

2.    An award of lost wages and benefits, including liquidated damages as provided by the FLSA;

3.    An award of compensatory and consequential damages, including damages for

emotional distress, shame and humiliation, in an amount appropriate to the proof

presented at trial;

4.      An award of punitive damages;

5.      An award to plaintiffs of reasonable attorneys' fees and costs;

6.       Pre- and post-judgment interest; and

7.      All other relief as this Court deems just.


Respectfully submitted,

*/s/ Lynne Bernabei*

_____
Lynne Bernabei, Esquire, D.C. Bar # 938936
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7102
(202) 745-1942
fax (202) 745-2627
Email:  Bernabei@Bernabeipllc.com


DATED:  October 29, 2013

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                    )
MEIXING REN, et al.                 )
                                    )
            Plaintiffs,             )        Civil No. 1:13-cv-1110-CKK
                                    )
      v.                            )
                                    )        ECF Case
PHOENIX SATELLITE TELEVISION        )
(US), INC.                          )
                                    )
            Defendant.              )
———————————————————————)

**<u>JURY TRIAL DEMANDED</u>**

Pursuant to Rule 38, Fed. R. Civ. P., Plaintiffs demand trial by jury on all claims so triable.

Respectfully submitted,


*/s/ Lynne Bernabei*
———————————————————————
Lynne Bernabei, Esquire, D.C. Bar # 938936
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7102
tel. (202) 745-1942
fax (202) 745-2627
email:  Bernabei@Bernabeipllc.com


DATED: October 29, 2013